H. H. BARTER and VIRGINIA BARTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barter v. Commissioner
Docket No. 35294-87
United States Tax Court
T.C. Memo 1990-142; 1990 Tax Ct. Memo LEXIS 166; 59 T.C.M. (CCH) 143; T.C.M. (RIA) 90142; March 19, 1990
Edward G. Maag and Ronald D. Stanley, for the petitioners. Michael W. Bitner, for the respondent. SHIELDS
*284 MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency of $ 464,208 in petitioners' 1980 income tax. After concessions, the issues remaining for decision are: (1) whether expenditures totaling $ 270,279 made by petitioner, H. H. Barter, are deductible as ordinary and necessary business expenses under section 162[1] or must be treated as the nondeductible cost of acquiring a capital asset; *167 and (2) whether petitioner, H. H. Barter, realized ordinary income in the amount of $ 116,585 by exchanging services for a parcel of land having a fair market in excess of the fair market value of the services. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The parties' stipulations and the exhibits associated therewith are incorporated herein by reference. Petitioners, H. H. Barter, who is also known as Sam Barter, and his wife, Virginia Barter, resided in Harrisburg, Illinois, at the time of filing their petition. They timely filed a joint income tax return for 1980 with the Internal Revenue Service Center in Kansas City, Missouri. All further references to petitioner in the singular are to H. H. Barter. Despite having only an eighth grade education and marginal reading and writing skills, petitioner has successfully operated an excavation and earth-moving business as a sole proprietor for over 40 years. He has participated *168 in several major projects including the construction of Interstate 57 which runs generally north and south through the eastern part of Illinois. In addition to his excavation business, petitioner in 1979 and 1980 was a partner with three other individuals in a partnership which owned and operated a Ramada Inn in Kentucky. On or about November 1, 1979, petitioner was contacted by Lowell V. O'Neal (O'Neal), who owned a 24-acre tract of land located near Marion, Illinois, and just to the west of the intersection of Interstate 57 and Illinois Route 13. The tract was roughly rectangular in shape and bordered Route 13 for approximately 1,300 feet. In 1979 the tract was the unreclaimed site of a former strip mine. It was part of an unincorporated and relatively undeveloped area situated to the west of the intersection, while the area immediately to the east of the intersection was developed as part of the incorporated township of Marion. Between November 1, 1979, and December 4, 1979, petitioner and O'Neal met on three or more occasions to discuss an arrangement under which petitioner would grade or level a portion of the 24-acre tract which O'Neal was initially trying to sell to *169 a group of real estate developers. Petitioner had some previous knowledge of the area's topography since he had been involved in other nearby construction projects, including the construction of Interstate 57. At some point during this period petitioner also met with O'Neal and the developers. During or shortly after this meeting petitioner quoted the developers a price for grading the tract of $ 0.50 per cubic yard of earth moved. During this same period O'Neal was also negotiating with petitioner's partners. Petitioner's partners were seeking to purchase a *285 portion of the tract as a site for another Ramada Inn. O'Neal was interested in having a major motel such as Ramada locate on a portion of the tract because he believed that the location of a major motel at the intersection would attract business to a smaller and less expensive motel that he was planning to construct on a portion of the balance of the tract. In still another meeting which occurred on or about December 3, 1979, petitioner learned that O'Neal preferred to sell 7.7 acres of the tract to petitioner rather than to petitioner's partners. After this meeting O'Neal on December 4, 1979, requested that petitioner *170 send him something in writing which would represent their "meeting of the minds" with respect to the project. Because of his poor writing skills, petitioner had an employee draft a letter, which was signed by petitioner and sent to O'Neal on December 4, 1979. The letter reads in pertinent part as follows: In accordance with our conversation this date regarding purchase of property, I propose to do the following for the purchase of the 7.7 acres: #1. I will grade approximately twenty-four (24) acres, more or less, according to the site plan of the engineer, Charles Miller. An agreement should be made for the approximate 7.7 acres that a frontage road across property from one interchange to the other interchange should take the needed right-of-way from the O'Neal land, the Barter land, and the land remaining. I agree to get 90% or better compaction with the dirt. #2. I agree to tie on the city sewer and bring the 12" sewer across the fourteen (14) acres to the Barter property line on the west side. #3. I agree to pay Charles Miller for the engineering for all the site grading. #4. I will spend all necessary time in Springfield to try to get the drainage corrected and *171 to try to get third lane in on Route 13 and promote traffic lights at both interchanges. I cannot guarantee this, however, but will use all influence with my Springfield connections to get it done. Petitioner's files contain a handwritten memorandum dated December 6, 1979, in which petitioner referred to the agreement with O'Neal as follows: 12/6/79 Proposed Agreement Between Lowell O'Neal & Sam Barter Concerning 24 acre real estate development Located at St. Rt. 13 & Int. 57 Drawing by LPS & Ass. Dated 12/3/79 Sam Barter to perform the following work: Extend the sewer to property A, B & C. To bring to grade, level & compact to 90% the entire 24 acres per engineering plans & supervision of Lyn Clarida. To bring frontage road to grade, provide rock base ready for black top. To spend necessary time in Springfield to get the drainage corrected etc. Lowell O'Neal to deed over a 7.7 acre tract of the above development for the above work. The 7.7 acres to have a 335' frontage by 1000' in depth. All buildings to maintain a 450' setback per drawing. On December 10, 1979, petitioner and O'Neal met with petitioner's attorney, John Feirich. During this meeting *172 Feirich was instructed to draw up a document to formalize the agreement that petitioner and O'Neal had reached. Feirich drafted a document entitled "Exchange Agreement" which reads in pertinent part as follows: WHEREAS, O'Neal is the owner of a large tract of land located [in] Marion, Illinois, * * * WHEREAS, Barter wishes to acquire a portion of said property * * * WHEREAS, O'Neal is desirous of Barter doing certain necessary developmental work for the benefit of the entire tract including the part that Barter is interested in acquiring, and WHEREAS, the parties hereto desire to exchange a part of the property now owned by O'Neal for developmental services to be performed by Barter, * * * * * * the parties hereto agree as follows: * * * Part of the property owned by O'Neal * * * which contains approximately 7.7 acres, shall be transferred by O'Neal by deed to Barter to be immediately delivered to the Escrowee hereinafter referred to in return for Barter's agreement to perform the developmental services as hereinafter set forth. * * * *286 * * * Barter agrees to perform the following developmental services for the entire tract shown on Exhibit A containing approximately *173 24 acres more or less, all in accordance with a site grading plan as prepared by Clarida Engineering Co., to-wit: * * * Extend the present twelve (12) inch city sewer line which is currently East of the property in question from thence [sic] to the West line of the 7.7 acre tract being transferred to Barter pursuant hereto; * * * Pay Clarida Engineering Co. for the supervisory services rendered in connection with the performance of the site grading. * * * Grade the approximately 24 acre tract in accordance with the site plan of Clarida Engineering Co. and obtain a compaction of at least 90 percent on the earth graded. * * * Grade, compact and place an eight inch rock base on the frontage road as the same appears on the aforesaid site grading plan. * * * In addition, Barter will spend all necessary time in Springfield to fairly attempt to get the drainage corrected and to get a third lane on Route 13 in front of the property and promote traffic lights at the intersections at the East and West extremities of the entire 24 acre tract. It is mutually understood that this undertaking by Barter is not a guarantee that any of these things will be accomplished, only a promise on *174 the part of Barter to make his best efforts in connection therewith. Upon examining the draft prepared by Feirich, O'Neal expressed concern over the fact that under its terms the parcel of land was to be conveyed to petitioner in a direct exchange for petitioner's services. At this point, O'Neal took a copy of the unsigned agreement and left the meeting to consult with his accountant as well as his attorney, J. Michael O'Byrne (O'Byrne). Upon his return to the meeting, O'Neal informed Feirich that he wanted the agreement re-drafted as two separate documents, one being a contract for the purchase and sale of the 7.7 acres of land and the other a contract for grading the 16.3 acres which O'Neal would retain. O'Neal also instructed Feirich to include in both contracts a monetary consideration of $ 77,000 but to make the agreements appear to be separate and apart from one another. Petitioner did not object to the revisions dictated by O'Neal and Feirich proceeded to draft two new contracts pursuant to O'Neal's instructions. The first, entitled "Contract For The Sale of Real Estate," reads in pertinent part as follows: CONTRACT FOR THE SALE OF REAL ESTATE
THIS AGREEMENT *175 made and entered into this 10th day of December, 1979, between Lowell V. O'Neal, * * * hereinafter called "Seller", and H. H. Barter, * * * hereinafter called "Purchaser". WITNESSETH: In consideration of the following agreements herein contained, the parties hereto agree as follows: 1. The Seller agrees to sell and the Purchaser agrees to buy the following described real estate: [7.7 acres] * * * 2. The Purchaser agrees to pay for said premises the sum of Seventy Seven Thousand Dollars ($ 77,000) payable as follows: Five Hundred Dollars ($ 500) down, which has heretofore been paid, the receipt whereof is hereby acknowledged; the balance of Seventy Six Thousand Five Hundred Dollars ($ 76,500) on or before June 15, 1980, but in no event prior to January 2, 1980, with no interest. * * * IN WITNESS WHEREOF, the parties hereto have set their hands the day and year first above written. The second contract, entitled "Agreement for Development," reads in pertinent part as follows: AGREEMENT FOR DEVELOPMENT
THIS AGREEMENT made and entered into this 10th day of December, 1979, by and between Lowell V. O'Neal, hereinafter referred to as O'Neal and H. H. Barter, hereinafter *176 called Barter, WITNESSETH: WHEREAS, O'Neal is the owner of [24 acres] * * * WHEREAS, Barter has purchased under contract a portion of said property [7.7 acres] * * * WHEREAS, O'Neal is desirous of Barter doing certain necessary developmental work for the benefit of the remainder of the entire tract [16.3 acres] * * * *287 WHEREAS, the parties hereto desire to set forth their agreement in that regard in writing. NOW, THEREFORE, in consideration of the premises, and in further consideration of the sum of Ten Dollars ($ 10) and other good and valuable consideration in hand paid by each party to the other, the receipt and sufficiency whereof is hereby acknowledged, the parties hereto agree as follows: 1. Barter agrees to perform the following developmental services for the * * * 16.3 acres more or less, all in accordance with a site grading plan as prepared by Clarida Engineering Co., to-wit: A. Extend the present twelve (12) inch city sewer line * * * B. Pay Clarida Engineering Co. for the supervisory services rendered in connection with the performance of the site grading. C. Grade the approximately 16.3 acres * * * in accordance with the site plan of Clarida *177 Engineering Co. and obtain a compaction of at least 90 percent on the earth graded. D. Grade, compact and place an eight inch rock base on the frontage road as the same appears on the aforesaid site grading plan. * * * 4. In consideration for the performance of the aforesaid work, O'Neal agrees to pay Barter the sum of Seventy Seven Thousand Dollars ($ 77,000), Five Hundred Dollars ($ 500) of which shall be prepaid upon the date of the execution of this agreement and the balance of Seventy Six Thousand Five Hundred Dollars ($ 76,500) shall be paid at such time as Clarida Engineering Co. shall state that Barter has performed all of his obligations * * * * * * IN WITNESS WHEREOF, the parties hereto have hereunto set their hands the day and year first above written. Petitioner and O'Neal signed the two contracts on December 10, 1979. However, the initial consideration of $ 500 called for in each contract was not paid upon their execution but with a letter dated December 20, 1979, in which O'Byrne as attorney for O'Neal enclosed a check for $ 500 to Feirich and suggested that O'Neal and petitioner exchange checks in that amount so as to provide evidence of the existence *178 of the agreements. The enclosed check was dated December 10, 1979, the date the contracts were executed. Feirich, as petitioner's attorney, was also advised by the letter from O'Byrne that there would be no conveyance of the 7.7-acre parcel of real estate until petitioner had fully performed under the "Agreement for Development." Prior to executing the two contracts and beginning work on the 16.3-acre tract, petitioner concluded from his experience on similar projects in the area that the most economical way to grade the property was with certain large earth-moving machines known as self-loading scrapers. At the time he owned several of these machines and knew from experience that with each such machine a substantial amount of earth could be moved a considerable distance by simply pushing or pulling the cutting edge of the machine along the ground at the excavation site until its large hopper or container was full. The machine was then driven to a dump site where its load was automatically dumped. Petitioner had previously employed his self-loading scrapers on excavation projects near the tract without experiencing any significant problem. On this project, however, he soon *179 discovered that the excavation site contained substantial deposits of huge boulders beneath the soil. The boulders not only rendered the scrapers virtually useless on the project and slowed the excavation, but they also damaged his machines. As a result, the delays and repairs substantially increased his expenses. The boulder problems finally forced him to rent other earth-moving equipment from a tractor dealership in order to complete the job. These rentals also contributed to an increase in his expenses to a point far beyond anything he had foreseen. Petitioner's problems with respect to the project were not limited to the rocky soil conditions. Under the Agreement for Development he was required to drain and fill a small pond left on the property as a result of the former strip mining activities. Petitioner and his project engineer were aware from the start that a larger pond located about one and a half miles from the project drained into the small pond, but they estimated that in about two days the small pond *288 could be pumped, filled with dirt, and compacted in such a manner as to prevent the water draining from the larger pond from welling up again in the smaller pond. *180 After renting two water pumps and pumping approximately 16,000,000 gallons of water from the small pond (its capacity as estimated by the project engineer), petitioner discovered that once the level of the water in the small pond was lowered to a certain point, the small pond refilled at a rate which was greater than the combined capacity of the two pumps. Before this problem was solved petitioner had pumped more than 160,000,000 gallons from the pond, or more than ten times as much as he had originally anticipated, and had moved 60,000 more yards of earth than he had originally estimated. Petitioner completed all work required under the Agreement for Development during 1980 with the exception of a frontage road. However, with his rock and water problems his total expenses had increased to $ 270,279, or almost $ 200,000 more than his original estimate of $ 77,000. Petitioners deducted the $ 270,279 as business expenses on their income tax return for 1980. In 1982 petitioner completed the frontage road at a cost of $ 4,827. O'Neal died in 1981. Prior to O'Neal's death, petitioner had received no payment for the work performed under the Agreement for Development, nor had he *181 received a deed to the 7.7 acres described in the Contract for the Sale of Real Estate. After O'Neal's death petitioner filed a claim against O'Neal's estate in the Probate Court, Champaign County, Illinois, for $ 77,000 under the Agreement for Development. He also petitioned the court to direct the executors of the estate to convey the 7.7 acres to him. Petitioner and the executors eventually settled his claims as evidenced by a docket entry in the probate court on June 23, 1982, which reads as follows: Executors agree to convey to H. H. Barter a tract of ground 370 feet in width with a depth necessary to achieve 7.7 acres measured from north curb line of proposed frontage road with a building set back line of 305 feet measured from north right-of-way line of Route 13 to apply in all tracts except the two out lots shown on Clarida Engineering site plan showing location of proposed frontage road. Said tract shall be immediately adjacent to and to the west of the tract where Best Inn is located near Marion, Williamson County, Illinois. Petitioner Barter to commence work as soon as possible and not later than July 15, 1982 on the 30 foot frontage road at its staked-out location *182 and complete on or before August 15, 1982. Petitioner Barter shall receive additional compensation for said frontage road work for that amount in excess of what he would have been required to do under the original agreement for development of December 10, 1979. Determination of additional compensation and supervision of said work shall be by Clarida Engineering, Marion, Illinois. Upon completion by Barter of the frontage road construction work the parties shall pay the additional sums of money pursuant to the terms of the contracts of December 10, 1979 of $ 76,500.00 and for the additional work above and make the land conveyance. The parties shall cooperate with the power line public utility in the movement of the power line poles now located along the north side of the tract herein involved and in the payment of the cost of such removal related to their respective frontages thereon. In his notice of deficiency, respondent disallowed petitioners' deduction of the $ 270,279 as business expenses in 1980. In an amended answer, respondent determined that petitioner had additional income in 1980 of $ 116,585, being the difference between the value as determined by respondent of *183 the 7.7 acres received ($ 386,864) and the amount of expenses ($ 270,279) incurred by petitioner in consideration for the 7.7 acres. OPINION In this proceeding respondent first contends that despite the form of the transaction between petitioner and O'Neal as set forth in their two written contracts, an examination of all of the surrounding facts and circumstances clearly indicates that the substance of the transaction was a simple exchange of services worth $ 270,279 by petitioner for 7.7 acres of land. Respondent further contends that the fair market value of the 7.7 acres received by petitioner in the exchange was $ 386,864 and that the excess of $ 116,585 of such value over the amount of petitioner's services was ordinary income to petitioner. Petitioners contend that the Agreement for Development and the Contract for the Sale of Real Estate represent separate transactions, the former being a contract for the grading and leveling of 16.3 acres, and the latter being for the sale of 7.7 acres. Petitioners also contend that the 7.7 acres had a value of only $ 77,000 in 1980. (1) Deductible Expenses or Acquisition Costs of a Capital Asset
*184 Deductions are allowable under section 162 for a taxpayer's ordinary and necessary expenses in carrying on a trade or business. Sec. 162(a). A current deduction is not allowed for a capital expenditure. Secs. 1.461-1(a), 1.263(a)-2, Income Tax Regs.; Commissioner v. Idaho *289 Power Co., 418 U.S. 1 (1974); Woodward v. Commissioner, 397 U.S. 572 (1970), affg. 410 F.2d 313 (8th Cir. 1969), affg. 49 T.C. 377 (1968). A capital expenditure made to acquire a depreciable or amortizable asset used in a trade or business is recoverable by the taxpayer over the asset's useful life. Capital expenditures made to acquire other assets are taken into account in the determination of gain or loss upon the disposition of the assets. Woodward v. Commissioner, supra at 575-576; Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 577-578 (1980). The substance-versus-form *185 doctrine is applicable to transactions where the form chosen by the parties fails to reflect the economic realities of the transaction. Commissioner v. Court Holding Co., 324 U.S. 331 (1945), revg. 143 F.2d 823 (5th Cir. 1944), revg. 2 T.C. 531 (1943); United States v. Cumberland Public Service Co., 338 U.S. 451 (1950). In determining substance, courts frequently look beyond the "superficial formalities of a transaction to determine the proper tax treatment" from all of the relevant facts. Blueberry Land Co. v. Commissioner, 361 F.2d 93, 101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964). Thus the formal written documents used by the parties are not controlling for tax purposes when the relevant facts clearly disclose that the objective economic realities are to the contrary. Furthermore, the desire of one or both of the parties to achieve a particular tax result is not particularly relevant. Commissioner v. Duberstein, 363 U.S. 278, 286 (1960). As we stated in Groetzinger v. Commissioner, 87 T.C. 533, 542 (1986): "In applying the substance-over-form *186 doctrine we are concerned with the intentions at the time of the agreement and economic realities as then perceived by the participants." From the record before us, it is clear that the economic realities of petitioner's transaction with O'Neal consisted of an exchange of petitioner's services for O'Neal's 7.7 acres. This is particularly evident from petitioner's letter to O'Neal dated December 4, 1979, in which petitioner proposed to perform the excavation work in exchange for the 7.7 acres. At trial the letter was admitted over petitioner's objection because where as here our inquiry is focused upon the substance of a transaction, we adhere to a liberal rule of admissibility when parol evidence is offered by or against a nonparty to a contract. See, e.g., Estate of Craft v. Commissioner, 68 T.C. 249 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979). The letter contains no mention of a monetary consideration for the services or the 7.7 acres. Instead petitioner described the meeting of the minds reached between O'Neal and himself as being for an exchange *187 of property for services. The same is true with respect to the memorandum petitioner prepared for his files which clearly indicates that an exchange was intended by the parties. Even without the above letter or memorandum the record contains more than sufficient facts and circumstances to support our finding that the disputed transaction in final analysis amounted to an exchange of services for land. The entire scenario which occurred in Mr. Feirich's office while the final documents were being drafted clearly supports a finding that an exchange occurred. Feirich's first draft of the understanding outlined a simple swap. When this draft for some unstated reason did not suit O'Neal's purposes, and when upon the advice of his attorney and accountant, O'Neal persuaded petitioner to go along, the transaction was recast in the form of the two separate contracts. However, "the simple expedient of drawing up papers" does not control a transaction for tax purposes when the substance of the transaction is clearly at odds with the form finally chosen. Commissioner v. Tower, 327 U.S. 280, 291 (1946), *188 revg. 148 F.2d 388 (6th Cir. 1945), revg. 3 T.C. 396 (1944). In order to determine the substance of a questioned transaction, we routinely examine all of the facts, including executed and unexecuted documents if considered by the parties. Houchins v. Commissioner, 79 T.C. 570, 590 (1982). When the documents finally agreed to by the parties are read together, it is apparent that petitioner and O'Neal retained the substance of the transaction as outlined, not only in Feirich's first draft but also in petitioner's letter to O'Neal of December 4, 1979. All that changed was the insertion of an ostensible consideration of $ 77,000 in both of the final documents. Further evidence that the final documents were not separate and distinct contracts is found in the statement by O'Neal's attorney in his letter to Feirich that "there will be no performance by Mr. O'Neal with respect to conveying the real estate until the development work is completed." The step transaction doctrine is another rule of substance over form that "treats a series of formally separate steps as a single transaction if such steps are in substance integrated, interdependent, *189 and focused toward a particular result." Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987). As we stated in Smith v. Commissioner, 78 T.C. 350, 389 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987): *290 The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping at points B and C. The whole purpose is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged. In this case, we find that the steps petitioner and O'Neal added to their agreement, namely the payment of a sum first to petitioner for the development work performed and then the payment of an identical sum by petitioner to O'Neal in exchange for the 7.7 acres, represent points B and C in what should have been a direct path from points A to D. Therefore, when the intervening steps are disregarded the transaction in question becomes a straightforward exchange of petitioner's services for O'Neal's parcel *190 of land. We conclude, therefore, that the $ 270,279 in expenses petitioner incurred in performing the development work are not deductible as ordinary and necessary business expenses but instead are nondeductible expenditures made to acquire a capital asset. (2) Ordinary Income of $ 116,585
In an amended answer, respondent claims that petitioner received $ 116,585 in unreported taxable income in the exchange with O'Neal. As we understand it, respondent's contention is that the 7.7 acres received by petitioner in the exchange had a fair market value in 1980 of $ 462,000, but the actual fair value of the services rendered by petitioner in exchange for the land was only $ 386,864. Consequently, respondent limits his claim of ordinary income to the difference between the $ 270,279 in expenses incurred by petitioner in performing the services and the fair value of such services as determined by respondent. Since this contention increases the amount of the deficiency set forth in the deficiency notice, it constitutes a new matter on which respondent has the burden of proof. Rule 142(a); Sanderling, Inc. v. Commissioner, 66 T.C. 743 (1976), affd. on that *191 issue 571 F.2d 174 (3d Cir. 1978), and cases cited therein. Fair market value of property as of any given date is a question of fact to be resolved by consideration of all relevant evidence in the record. Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). Fair market value is also a question of judgment rather than mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Duncan Industries, Inc. v. Commissioner, 73 T.C. 266 (1979). In making a determination of fair market value we may rely on the opinion of experts. Estate of O'Connell v. Commissioner, 640 F.2d 249 (9th Cir. 1981), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; Palmer v. Commissioner, 523 F.2d 1308 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Estate of Piper v. Commissioner, 72 T.C. 1062 (1979). The opinions of experts must, however, be weighed in light of each expert's qualifications and all other relevant *192 evidence of value. Johnson v. Commissioner, 85 T.C. 469, 477 (1985). If warranted, we may choose the opinion in toto of one expert witness at the expense of another or others. See Palmer v. Commissioner, supra at 1310. In support of his contention respondent relies upon the valuation report and testimony of James Eisenhauer (Eisenhauer), who has been employed as a General Engineer by respondent since 1981, a position which involves the appraisal of various types of assets including real estate. Prior to 1981 he was employed as a civil engineer for 12 years by the Illinois Department of Transportation. With respect to the fair market value of the 7.7 acres, Eisenhauer concluded that the parcel was worth $ 462,000 or $ 60,000 per acre in 1980. His appraisal is based in substantial part upon the sale prices of three parcels of land in the area which he considered comparable to the subject parcel. We, however, are unable to attribute much weight to his valuation because of differences which exist between the subject parcel and the properties he considered comparables. We begin by noting that the parcels chosen by Eisenhauer as comparables *193 are located to the east of Interstate 57 in an area which was considerably more developed in 1980 than the area to the west of Interstate 57 where the subject parcel is located. For example, his first comparable is located in Marion in an area of subdivided city lots complete with streets, alleys, and utilities, while the subject parcel in 1980 was an undeveloped piece of land located in an unincorporated area. Furthermore, even with its improved location the first comparable sold for $ 18,033 per acre in 1980, which is a great deal less than the $ 60,000 per acre which Eisenhauer attributes to the subject parcel. The evidentiary value of his second comparable is also limited by the confusion in the record as to its character and location. Mr. Eisenhauer testified that the second property was a vacant unimproved lot which sold in 1980 for $ 104,603 per acre. Petitioner, however, introduced credible testimony that the property was at that time the site of a Kentucky Fried Chicken franchise. The record also contains evidence that the location of the property is at least 1000 *291 feet farther from the subject parcel than Eisenhauer stated in his testimony. With respect to his third *194 comparable, a 1.69-acre lot, Eisenhauer stated in his report that it sold in 1983 for $ 104,720 or $ 61,994 per acre. However, at trial he admitted that the sales price was only $ 50,000 and that he had added to the sales price the cost of constructing a frontage road because he concluded that the addition of the frontage road made the property more comparable to the subject parcel. While the actual sales price of this alleged comparable in 1983 was $ 29,586 per acre, we note that it is adjacent and similar to Eisenhauer's first comparable, which sold for only $ 18,033 per acre in 1980, the year under consideration. Eisenhauer also based his valuation of the 7.7-acre parcel on a sale of an interest in 3.76 acres which was part of the 16.3 acres retained by O'Neal. In 1980 O'Neal sold a one-half interest in the 3.76 acres to one of his partners for a consideration of $ 115,000 in cash plus some other real estate. While the stated cash price paid for a one-half interest in this 3.76 acres amounts to nearly $ 60,000 per acre, we note that the interest was conveyed by O'Neal to a partner as part of a tax-free transaction and the transaction included an unknown amount of noncash consideration, *195 the value of which cannot be determined from the record. Furthermore, petitioner introduced evidence in rebuttal that in 1980 the 3.76-acre lot had a total assessed value of $ 25,758 or $ 6,850 per acre for local tax purposes. In support of his valuation of the 7.7 acres at not more than $ 77,000 petitioner submitted the testimony and appraisal report of Louis A. Murphy, an experienced real estate broker and appraiser, and a member of the American Fraternity of Real Estate Appraisers. Petitioner also submitted the testimony and appraisal report of Philip L. Johnson, a real estate broker with experience in buying and selling commercial real estate, and who is certified as an appraiser by the International Organization of Real Estate Appraisers. Murphy valued the subject parcel at $ 46,200 or $ 6,000 per acre. His appraisal is based upon six sales of properties in the same general area which he considered as comparable to the 7.7 acres. Johnson appraised the subject parcel at $ 50,050 or $ 6,500 per acre based on a group of sales of property of approximately the same size. Both Murphy and Johnson listed other properties similar to the subject parcel and located in the same general *196 area which sold for a per-acre price that was less than their appraisals. They both included in their list of properties considered as comparables the purchase by O'Neal in 1978 of a one-acre lot for $ 53,200 which by the date of trial was the site of a fast-food restaurant. They both concluded, however, that this sale included a substantial premium because it was the first point of access off the interstate ramp and it was of particular value to O'Neal because he already owned the adjacent land to the north and west. Furthermore, it was a small parcel and even respondent's expert testified that smaller parcels of land tend to sell for a greater price per acre than larger parcels which are similarly situated. In view of all of the foregoing we are satisfied, and so hold, that respondent has failed to carry his burden of proving that the 7.7 acres had a fair market value in excess of $ 77,000 in 1980. With respect to the value of the services rendered by petitioner in exchange for the 7.7 acres, respondent again relies upon the testimony and report of Mr. Eisenhauer, who concluded that the fair market value of the development work petitioner agreed to perform was $ 386,864. His *197 appraisal of such work is based on a statewide average which he obtained from the Illinois Department of Transportation for the price of earth excavation. According to the Transportation Department the statewide average of earth excavation in 1988 was $ 4.50 per cubic yard of earth moved. By discounting this figure back to 1980, Mr. Eisenhauer concluded that the cost of such excavation in 1980 was $ 3.11 per cubic yard of earth moved. In rebuttal to Eisenhauer's appraisal, petitioner submitted a tabulation of bids which was prepared by the Illinois Abandoned Mined Lands Reclamation Council with respect to the excavation in 1987 of 990,000 cubic yards of earth and 400 cubic yards of mine refuse plus other reclamation work at the site of an abandoned mine located approximately 20 miles south of the subject property. The lowest bid received with respect to this project was $ 0.65 per cubic yard of earth moved. Several other bids were only slightly higher. Nevertheless, respondent contends that we should attach no weight to the above tabulation because the bids upon which the tabulation is based pertain to work that was to be performed in 1987. Respondent, however, conveniently *198 overlooks the fact that his expert based his valuation on figures that were even further removed in time. It is logical to assume that if an excavation similar in nature, size, and location to petitioner's could have been performed for $ 0.65 per cubic yard in 1987, then it is quite probable that petitioner could have reasonably expected to perform his excavation for even less in 1980. In fact, we have found that in November of 1979 petitioner quoted a price of $ 0.50 per cubic yard to O'Neal and some prospective developers. The tabulation by the Reclamation Council tends to support petitioner's contention that he could have performed the work at or about his 1979 quote except for the rock and water *292 problems he encountered. Our conclusion in this respect is further bolstered by the fact that Mr. Eisenhauer discounted his figures by more than 30 percent to allow for inflation that occurred between 1980 and 1988. Respondent also points out that the tabulation of bids submitted by petitioner contains bids for the removal of mine refuse at $ 2.00 to $ 7.50 per cubic yard. Presumably, respondent is contending that petitioner was aware of the substantial rock deposits that existed *199 beneath the surface of the tract and knew that it would cost more than $ 77,000 to excavate the property pursuant to his agreement with O'Neal. The record, however, contains no support for this contention by respondent. Petitioner was generally experienced in excavation work and was familiar with soil conditions in the area. He consulted with an engineer who estimated the amount of rock petitioner could expect to encounter. Unfortunately for petitioner, the engineer's estimate was considerably low. Finally, we are convinced that if he had known of the extent of the mine refuse beneath the surface of the tract, petitioner would not have begun the project with the self-loading scrapers which were so inappropriate for the task that they greatly increased his expenses. We, therefore, are convinced that petitioner was not aware of the problems he was to encounter with respect to the rocks and the water on the property and that upon undertaking the job he expected to exchange excavating services worth not more than $ 77,000 for a parcel of land worth about the same amount. Consequently, on this record we find that respondent has failed to carry his burden of proving that petitioner *200 realized any ordinary income upon the exchange of his services for the 7.7 acres of land. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the tax year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩