JESSE A. RUF AND ANGELA K. RUF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LUMBER CITY CORPORATION, SUCCESSOR IN INTEREST TO NEIMAN-REED LUMBER AND SUPPLY COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ruf v. Commissioner
Docket Nos. 3471-91, 3588-91
United States Tax Court
T.C. Memo 1993-81; 1993 Tax Ct. Memo LEXIS 88; 65 T.C.M. (CCH) 2035; March 10, 1993, Filed *88 For petitioner: Kevin O'Hara. For respondent: Gregory Arnold. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Docket No. 3471-91 Jesse A. and Angela K. Ruf
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
$  1,098
--  --
--   1987
696,399
$ 34,820
50% of the
$ 174,100
interest due
on $ 696,399
Docket No. 3588-91 Lumber City Corporation
Additions to Tax
Year
Sec.
Sec.
Sec.
Ended
Deficiency
6653(a)(1)
6653(a)(1)(A)
6653(a)(2)
2/29/80
$ 28,194
--
--
--
2/28/81
71,355
--
--
--
2/28/83
-0- --
--
--
2/29/84
-0- --
--
--
2/28/85
303,558
$ 15,178
--
50% of the
interest due
on $ 303,558
2/28/86
-0- --
--
--
2/28/87
341,551
--
$ 17,078
--
Additions to Tax
Year
Sec.
Sec.
Ended
6653(a)(1)(B)
6661(a)
2/29/80
--
--  2/28/81
--
--  2/28/83
--
--  2/29/84
--
--  2/28/85
--
$ 75,890
2/28/86
--
--  2/28/87
50% of the
85,388
interest due
on $ 341,551
*89 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues presented for decision are: (1) Whether $ 789,453 distributed by Neiman-Reed Lumber and Supply Company (Neiman-Reed) to Jesse A. Ruf (Ruf) in 1987 pursuant to a stock purchase agreement should be characterized as sale proceeds, as a loan, or as a constructive dividend; (2) whether "consulting fees" paid by Neiman-Reed to several of its shareholders were ordinary and necessary business expenses to Neiman-Reed under section 162(a) or constructive dividends paid with respect to the Neiman-Reed stock; (3) whether Ruf and his wife, Angela K. Ruf (the Rufs), are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B) and for substantial understatement of income tax under section 6661(a); and (4) whether Lumber City Corporation (Lumber City), Successor in Interest to Neiman-Reed, is liable for additions to tax for negligence under sections 6653(a)(1), 6653(a)(2), 6653(a)(1)(A), and 6653(a)(1)(B) and for substantial understatement of income tax under section *90 6661(a).
FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The Rufs resided in Agoura, California, when they filed their petition. Lumber City had its principal office in Van Nuys, California, when it filed its petition. Lumber City is the successor in interest to Neiman-Reed and is liable for any tax liabilities of Neiman-Reed. Mulholland Stock Transfer
Neiman-Reed, a corporation that owned and operated hardware stores, entered into a Management Agreement, dated April 1, 1986, with Mulholland Funding Corporation (Mulholland) for the managerial services of Ruf. Mulholland had been wholly owned and operated by Ruf since April 1979. Also, on April 1, 1986, Ruf acquired an option to purchase all outstanding Neiman-Reed capital stock at anytime through March 31, 1989. On December 29, 1986, Ruf assigned this option to Stanislaus Funding Corporation (Stanislaus), his solely owned personal holding company. Stanislaus immediately exercised the option and became the sole shareholder of Neiman-Reed. In exchange for the Neiman-Reed stock, Stanislaus issued promissory notes (Stanislaus notes) *91 payable to Robert Neiman (Neiman), to Thornton Snider and Bernell Snider (the Sniders), and to Leon M. Cooper (Cooper) and Neiman as co-trustees of the estate of Robert Reed (collectively, the Neiman-Reed shareholders) in principal sums totaling $ 5,150,000. Ruf and Neiman-Reed entered into a Stock Purchase Agreement (the Mulholland Stock Purchase Agreement), signed by Ruf on December 30, 1986, but with a stated closing date of December 29, 1986, under which Ruf agreed to sell to Neiman-Reed all outstanding common stock in Mulholland. The price was to be determined pursuant to a formula, based on the book value and net earnings of Mulholland, but not to exceed $ 1 million. Upon transfer of the Mulholland stock, Ruf received a promissory note (the Neiman-Reed note) from Neiman-Reed in the initial principal sum of $ 1 million, dated as of the closing under the Mulholland Stock Purchase Agreement and payable on March 31, 1987. The Neiman-Reed note stated that it was subject to the terms of the Mulholland Stock Purchase Agreement, specifically including the provision for principal adjustment according to the formula mentioned above. The Neiman-Reed note was secured by Neiman-Reed's *92 pledge of all of the Mulholland stock. As a result of the above transactions, Ruf owned all of the stock in Stanislaus which owned all of the stock in Neiman-Reed which, in turn, owned all of the outstanding stock in Mulholland. The Rufs' 1986 return reported the transfer of the Mulholland stock as an installment sale at a price of $ 772,313, but with no tax due because no funds had been received in 1986. On March 20, 1987, Neiman-Reed transferred to Ruf $ 789,453 pursuant to the Mulholland Stock Purchase Agreement. A check dated March 16, 1987, in the amount of $ 675,000 and payable to "Jesse A. Ruf/Stanislaus Funding" was drawn on Ruf's account and deposited into Stanislaus' bank account on the same day. Five checks dated March 31, 1987, totaling $ 650,000 and payable to the Neiman-Reed shareholders were drawn on Stanislaus' account. An audited financial statement by Touche Ross & Co. (Touche Ross) dated May 12, 1987, and covering the period from December 29, 1986, to February 28, 1987, characterized the transfer of the Mulholland stock to Neiman-Reed as a contribution to capital. In October 1987, respondent notified the Rufs of the audit of their tax liability. The Rufs *93 did not report the $ 789,453 on their 1987 income tax return. The Neiman-Reed income tax return for 1987 indicated that Neiman-Reed acquired Mulholland from Stanislaus "by a contribution to capital". However, the original documents in connection with the transfer of the Mulholland stock were never modified to reflect that the transaction was not a sale. On May 3, 1988, Neiman-Reed merged with both Stanislaus and Mulholland and was the surviving entity of those mergers. On November 15, 1988, Neiman-Reed changed its name to Lumber City Corporation. On September 1, 1988, the Rufs' attorney, Ronald C. Lazof (Lazof), sent a letter to Ruf, captioned "Ruf IRS Audit - I.D.R. #2" that stated: The actual amount payable by the formula purchase price for the Mulholland Funding stock was * * * [$ 789,453.02]. This amount was paid to you not as sale proceeds but as a loan to shareholder on March 20, 1987. * * * [$ 675,000] of this amount was then lent by you to Stanislaus Funding as a shareholder loan and Stanislaus used this amount to make its payment then due to the former shareholders of Neiman-Reed.
On February 28, 1989, Ruf paid $ 957,140 to Lumber City, purportedly as repayment *94 of the $ 789,453 loan plus interest of $ 167,687. The Rufs' 1986 and 1987 tax returns were prepared by their accountant, William Simon (Simon), a certified public accountant (C.P.A.). An Amended U.S. Individual Income Tax Return for 1986 was prepared for the Rufs in which the Mulholland stock transfer was recharacterized as a section 351 transfer by a shareholder to a controlled corporation. The amended return was never filed with the Internal Revenue Service (IRS). Odessa Property Transaction
On January 13, 1983, Neiman and the Sniders purchased the ground lease on the property located at 6633 Odessa Avenue, Van Nuys, California, and the improvements thereon, and a purchase option for the underlying property (inclusively, the Odessa property) for $ 2,287,600. On January 29, 1983, Neiman and the Sniders transferred the Odessa property to Neiman-Reed. According to the June 1986 corporate minutes of Neiman-Reed, the Odessa property was listed for sale at $ 2.6 million with Coldwell Banker, with a proviso that a "selling price" of less than $ 2.3 million would be rejected. On June 30, 1987, when Ruf was the sole shareholder of Stanislaus, which was at that time the sole *95 shareholder of Neiman-Reed, Ruf purchased the Odessa property from Neiman-Reed for $ 1.5 million. At the time of the sale, the owner of the Odessa property was obligated to lease the property back to Neiman-Reed. No broker's fees were paid with respect to the sale. On September 3, 1987, Ruf exercised the purchase option for $ 175,000. In August 1989, the Odessa property sold for $ 3.5 million. Consulting Fees
At all relevant times prior to July 31, 1981, the stock of Neiman-Reed was held as follows: Shareholder
Percent Ownership
Robert Neiman 33.3
Robert Reed 33.3
Thornton Snider 16.6
Bernell Snider 16.6
The Sniders had special knowledge of and were very experienced in the lumber industry. They provided to Neiman-Reed expertise and connections for various services required in the lumber industry, including sources of lumber and trucking services. The Sniders also acted as directors for Neiman-Reed and attended board of directors' meetings of Neiman-Reed. On July 31, 1981, UBM Group Limited (UBM), a public company based in Bristol, England, obtained the majority of the Neiman-Reed stock. In April 1985, Neiman-Reed redeemed all of the stock owned by UBM. *96 From July 31, 1981, until April 1985, the stock of Neiman-Reed was held as follows: Shareholder
Percent Ownership
Robert Neiman
16.6
Robert Reed (or his estate)
16.6
Thornton Snider
8.3
Bernell Snider
8.3
UBM
51.0
During the applicable periods, Neiman-Reed had a fiscal year that ended on the last day in February. Neiman-Reed did not make any formal dividend payments in the fiscal years that ended in February 1980 through February 1986. However, a consultant agreement between UBM and Neiman-Reed (the UBM Consultant Agreement) and consultant agreements between each of the Sniders and Neiman-Reed (the Snider Consultant Agreements) were executed as of July 31, 1981, and were for an open-ended period thereafter (terminable by either party upon 10 days' written notice). The UBM Consultant Agreement provided for $ 200,000 in annual consulting fees to be paid to UBM, and the Snider Consultant Agreements provided for $ 30,000 in annual consulting fees to be paid to each of the Sniders. The amount of the UBM consulting fee was reduced as of December 1981 as a result of the death of Robert Reed (Reed) in that month. Various officers and employees of UBM visited Neiman-Reed *97 to provide suggestions and opinions in the operations of Neiman-Reed, to coordinate the accounting system of Neiman-Reed with that of UBM, and to attend Neiman-Reed board meetings from 1982 through 1985. Almost all of these employees remained on UBM's payroll. John Munro (Munro), a UBM executive and director, commenced employment at Neiman-Reed in 1983 and was appointed to the position of deputy chairman on July 12, 1983. On April 10, 1984, the Neiman-Reed board of directors provided for a separate reimbursement of $ 60,000 per year to UBM, ostensibly for Munro's services. Neiman-Reed made payments to shareholders as follows: Year Ended
UBM
Sniders
Munro [1]
Feb. 1980
--   $ 85,000
--  Feb. 1981
--   85,000
--  Feb. 1982
$  61,500
--  --  Feb. 1983
47,500
14,250
--  Feb. 1984
78,000
23,400
--  Feb. 1985
227,092
83,431
$ 60,000
Feb. 1986
10,618
60,000
5,000
*98 Neiman-Reed also paid premiums on life insurance policies that benefited Reed (until his death in December 1981) and Neiman. Respondent has not disallowed deductions claimed for these premiums. Letters dated March 17, 1982, and June 15, 1982, from Howard M. Koff, an insurance salesman of HMK Financial, to Neiman-Reed stated that "the Consulting Agreement was predicated upon life insurance premiums being paid on behalf of" Neiman and Reed and that, "in accordance with the intent of the Consulting Agreements", as a result of Reed's death, the "amount of the consulting fees to each of the consultants should be reduced". In a November 4, 1982, letter from Roger Pinnington (Pinnington), the chief executive officer of UBM, to Neiman-Reed's then president Neiman, Pinnington requested a review of the "dividend position" of Neiman-Reed with respect to its shareholders. He stated that UBM's cash and profit position had deteriorated to the extent that "cash flow and a share of the profits from Neiman-Reed was needed in the U.K." and that UBM was considering "management charges" as a possible solution. An interoffice memorandum dated February 5, 1985, from the chief financial officer of *99 Neiman-Reed to the chief executive officer of Neiman-Reed refers to the insurance premiums paid on behalf of Neiman as "Neiman's consultancy fees." The letter further states that the "premiums represented 1/6 of consultancy fees per annum, therefore, after R. Reed's death the fees for the remaining parties should be: UBM 3/6 of fees * * * T & B Snider 1/6 of fees". An undated telex from Cooper to UBM advised UBM of the "amount payable to Neiman" and, on the basis of that amount and relative ownership of Neiman-Reed, Cooper stated that "UBM should receive $ 141,000 as consultant fees." The payments made under the UBM Consultant Agreement and the Snider Consultant Agreements were predicated upon the payment of the insurance premiums on behalf of Neiman and Reed. Respondent has disallowed the following deductions for consulting fees paid to Neiman-Reed shareholders on the grounds that the payments were constructive dividends: Year Ended
Amount Disallowed
Feb. 1980
$  61,291
Feb. 1981
2,700
Feb. 1983
61,750
Feb. 1984
101,400
Feb. 1985
370,523
Feb. 1986
22,696
OPINION Mulholland Stock Transfer
The transfer of the Mulholland stock from Ruf to Neiman-Reed and *100 the distribution to Ruf of $ 789,453 can be described in a number of ways, each generating a different result under the tax laws. The Rufs, at the time of the transfer of the Mulholland stock and on their 1986 income tax return, treated the transfer as an installment sale by Ruf to Neiman-Reed. The Rufs claim that, in 1987, they recharacterized the transaction as a contribution to the capital of Neiman-Reed and an unrelated loan to Ruf. Respondent contends that the payment was to Ruf in respect of his stock and was therefore a constructive dividend. The Rufs argue that, if the distribution is not a loan, it should be characterized as a sale, not as a constructive dividend, because Ruf did not own directly any stock in Neiman-Reed. They argue, alternatively, that, if the distribution is deemed a constructive dividend, the recipients are the Neiman-Reed shareholders and Ruf was merely a conduit for the funds. Finally, respondent, in her post-trial brief, introduced a new theory in which she asserts that under section 304(a) the transaction should be deemed a distribution in redemption of stock and thereby a constructive dividend. The Rufs argue that the objective economic realities, *101 rather than the particular form in which that agreement was cast, govern the tax consequences of this transaction. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). They claim that, although originally designed as a sale, the transfer of Mulholland stock was actually a contribution to capital and the distribution was really a loan to Ruf. The Rufs rely on Yamamoto v. Commissioner, 73 T.C. 946 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982), and Groetzinger v. Commissioner, 87 T.C. 533 (1986), for the argument that they should be allowed to assert substance over form. In Yamamoto, the Court explained: we will assume that the acts of the parties and documentation surrounding the transactions reflect the intent of the parties unless we are given some evidence to the contrary. We will not relieve a party from the tax consequences of the form in which he or she appears to have molded a transaction, in the absence of proof that that form does not properly reflect the transaction. * * * [ 73 T.C. at 954.] *102 In Groetzinger, the Court stated that, under certain circumstances, a taxpayer may be entitled to argue substance over form. To be successful in a substance over form argument, a taxpayer must provide objective evidence that the substance of the transaction was in accord with the position asserted by taxpayer rather than the form set forth in the relevant documents. Groetzinger v. Commissioner, 87 T.C. at 541. See also Estate of Durkin v. Commissioner, 99 T.C.     (1992). The Rufs' position that the $ 789,453 distribution was a loan requires a dual supposition: (1) That the transfer of the Mulholland stock was a contribution to capital under section 351 as claimed on the Rufs' (executed but unfiled) 1986 amended income tax return and (2) that, at the time of the distribution, it was intended by both Neiman-Reed and Ruf to be a loan. The Rufs have not shown that either assumption is accurate. To claim that a transfer was a nonrecognizable contribution to capital, the Treasury regulations prescribe that the transfer be identified as a section 351 transfer. Sec. 1.351-3, Income Tax Regs.Section 1.351-3(a), Income Tax Regs., requires *103 that taxpayers file a detailed statement describing the section 351 exchange. Utley v. Commissioner, 906 F.2d 1033, 1037 (5th Cir. 1990), affg. in part and remanding on another issue T.C. Memo. 1988-575. The Rufs never amended their 1986 return or otherwise fulfilled the reporting requirements under section 351. Whether an advance from a corporation to its shareholder constitutes a bona fide loan is a factual question and depends upon the existence of an intent, at the time the advances occurred, on the shareholder's part to repay the advances and an intent on the corporation's part to enforce the obligations. Berthold v. Commissioner, 404 F.2d 119, 122 (6th Cir. 1968), affg. T.C. Memo. 1967-102; Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). Where the shareholder receiving the advances controls the corporation, the transaction must be carefully scrutinized. Haber v. Commissioner, supra at 266. "The intention of the parties *104 relates not so much to what the transaction is called, or even what form it takes, as it does to an actual intent that the money advanced will be repaid." Berthold v. Commissioner, supra at 122. The stock transfer occurred in December 1986. The Rufs have not shown that they treated the stock transfer as a contribution to capital prior to receiving an audited financial statement from Touche Ross characterizing the transfer as such. Ruf received the distribution in March 1987. The earliest indication provided by the Rufs that the distribution was to be treated as a loan was in the September 1988 letter from Lazof, stating that "the actual amount payable * * * for the Mulholland Funding stock * * * was paid to you not as sale proceeds but as a loan." The amount of the distribution was determined by the formula provided in the Mulholland Stock Purchase Agreement that was based on the book value and earnings of Mulholland. This calculation is more indicative of a distribution in consideration for the purchase of the Mulholland stock than of a distribution of an unrelated loan. Thus, at the time of the distribution, Ruf did not have the requisite *105 intent to repay the corporation. Additionally, Ruf's subsequent actions did little to rectify the appearance that the transaction was a sale. The original documents for the transfer were never modified to reflect that the transaction was not a sale, and the transaction lacked many of the common indications of true debt. There was no note or other loan documents presented as evidence of a loan. The alleged loan was unsecured, there was no fixed repayment schedule, and there was no mechanism set up for the payment of interest. The Rufs rely on Bernstein v. Commissioner, T.C. Memo. 1975-253, for their argument that written evidence of indebtedness and books and records and testimony may provide proof of valid indebtedness. The Rufs have offered as evidence of a loan (1) an unfiled amended return for 1986 that stated that the transfer was a section 351 contribution to capital, (2) testimony that Neiman-Reed carried the amount on its books as a loan, (3) testimony that, after being informed by Touche Ross of the recharacterization of the transaction, Ruf treated the transaction as a loan, and (4) a payment by Ruf to Lumber City in February 1989, which *106 payment the Rufs state was repayment of the loan with interest (although this was after the Rufs were informed that they were under IRS audit and after the corporations were merged and wholly owned by Ruf). None of these show either a contemporaneous intent to treat the distribution as a loan or any objective evidence that a loan existed. The Rufs seek to abandon their own agreement in order to obtain tax relief. They have failed to persuade the Court that their documentation of the transaction, including their 1986 tax return, the Mulholland Stock Purchase Agreement, and the Neiman-Reed note, does not reflect the substance of the transaction. The Rufs present other theories, including the step-transaction doctrine and the integrated transaction theory, to show that the Mulholland stock transfer was just one part of a larger transaction, the ultimate goal of which was the transfer of the Neiman-Reed stock to Stanislaus (Ruf's wholly owned corporation). The stock transfer and distribution afforded Ruf the means with which to pay for the Neiman-Reed stock. The Rufs have failed to show that these doctrines would enable us to ignore the manner in which Ruf chose to finance the purchase *107 of Neiman-Reed. They have also failed to present a workable alternative to characterizing the transaction as a sale. We, therefore, do not address the merits of the Rufs' alternate theories. The Rufs argue, alternatively, that, if the distribution were a constructive dividend as proposed by respondent, Ruf would have been a mere conduit for the funds and the true recipients of the dividend would have been the Neiman-Reed shareholders. The Rufs claim that there was a circular flow of funds driven by the Neiman-Reed shareholders because (1) the Neiman-Reed shareholders required the sale of the Mulholland stock to Neiman-Reed as security for the Stanislaus notes, (2) Ruf transferred $ 675,000 to Stanislaus within days of receiving the $ 789,453 distribution from Neiman-Reed, and (3) Stanislaus immediately transferred $ 650,000 to the Neiman-Reed shareholders as initial payments on the Stanislaus notes. Therefore, the Rufs argue, the constructive dividend was really to the Neiman-Reed shareholders. However, the Neiman-Reed shareholders did not control or hold stock in Neiman-Reed at the time of the distribution. Furthermore, the Rufs cite no authority for the theory that the Neiman-Reed *108 shareholders, having sold all of their stock in Neiman-Reed, would have received constructive dividends when they received payments under the Stanislaus notes. We are not persuaded that Ruf was merely an agent through which the ex-shareholders of Neiman-Reed extracted profits from the company. Respondent takes the position that the $ 789,453 distribution from Neiman-Reed was a constructive dividend to Ruf in 1987 under section 301. Section 301 provides for the tax treatment of distributions of property by a corporation to a shareholder with respect to its stock. Section 301(c)(1) provides that the portion of a distribution that is a dividend (as defined in section 316) shall be included in gross income. Section 316 defines a dividend as any distribution of property made by a corporation to its shareholders out of its earnings and profits. (The Rufs have made no representations with respect to the earnings and profits of Neiman-Reed during 1987 and have not proven that the earnings and profits of Neiman-Reed were less than the full amount of the distribution.) The regulations under section 301 provide that that section is not applicable to an amount unless that amount is paid *109 to a shareholder in his capacity as such. Sec. 1.301-1(c), Income Tax Regs.
When the $ 789,453 distribution was made to Ruf in March 1987, all of the stock in Neiman-Reed was owned by Stanislaus, Ruf's wholly owned corporation. Ruf was only an indirect shareholder of Neiman-Reed. Section 318(a) sets out rules for constructive ownership of stock. Under this section, Ruf would be deemed to have owned 100 percent of the stock in Neiman-Reed at the time of the distribution. Sec. 318(a)(2)(C). However, by its terms, section 318(a) applies only "for purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable". Neither section 301 nor section 316 expressly incorporates section 318. Accordingly, the Neiman-Reed stock owned by Stanislaus cannot be attributed to Ruf under section 318 for purposes of determining whether distributions from Neiman-Reed were dividends to him under sections 301 and 316. Respondent cites two cases, Young v. Commissioner, 5 T.C. 1251 (1945), and Brown v. Commissioner, T.C. Memo. 1971-166, for the argument that the distribution from *110 Neiman-Reed to Ruf was a dividend even though no constructive ownership rules apply. Both cases can be distinguished factually from the Rufs' case, and neither case specifically addressed section 318. Further, respondent presents no argument as to why we should view this transaction as a constructive dividend rather than as an installment sale. There is no indication in the record that the consideration paid for the Mulholland stock was above market value. We are not persuaded that the installment sale form does not reflect the substance of the transaction. In fact, respondent describes the transaction as a sale throughout respondent's arguments. Thus, we see no reason to characterize this distribution as a payment to Ruf in respect of his stock instead of as a payment to Ruf in consideration for his transfer of the Mulholland stock to Neiman-Reed. In respondent's answering brief, respondent asserts that the Mulholland stock transaction and subsequent distribution are properly described under section 304(a), which treats certain stock purchases as distributions in redemption of stock. Respondent did not assert the application of section 304(a) to the Mulholland stock transaction *111 during the audit or appeal stages of the Rufs' case nor at anytime prior to or during trial. Respondent's first mention of section 304(a) was in respondent's answering brief. The Rufs object to the use of this new theory. Rule 142(a) provides that the burden of proof is on the taxpayer except that, "in respect of any new matter" or increases in deficiency pleaded in the answer, it shall be on respondent. Achiro v. Commissioner, 77 T.C. 881, 890 (1981), sets forth a standard for determining whether a new theory presented by a party constitutes a "new matter": The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. However, if the assertion * * * either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. * * * [Citations omitted.]
Additionally, under certain circumstances, a party may be precluded from introducing a new issue at the briefing stage. The rule that a party may not raise a new *112 issue on brief is not absolute. Rather, it is founded upon the exercise of judicial discretion in determining whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent evidence. [ Sundstrand Corp. v. Commissioner, 96 T.C. 226, 403-404 (1991) (quoting Ware v. Commissioner, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990)).]
The Rufs argue against the application of section 304(a) here. They claim that installment treatment is not available in the context of section 304(a). Brams v. Commissioner, 734 F.2d 290 (6th Cir. 1984), affg. T.C. Memo. 1983-25; Cox v. Commissioner, 78 T.C. 1021 (1982). Thus, respondent's new theory would result in an increased deficiency to the Rufs in 1986, the year in which the Neiman-Reed note was received by them. Under this reasoning, if the Court determines that section 304 applies to the Mulholland stock transaction, a new *113 trial would be required to determine Neiman-Reed's earnings and profits in 1986 and the fair market value of the note on the date of the distribution. Secs. 301, 316; sec. 1.301-1(b), Income Tax Regs. In other words, the raising of section 304(a) would require the presentation of new evidence. Therefore, the Rufs argue, (1) the section 304(a) issue is a new theory on which respondent must bear the burden of proof under Rule 142(a) and (2) the resolution of the section 304(a) issue would require the Court to hear new evidence which would be contrary to the established policy of the Court to "try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation." Markwardt v. Commissioner, 64 T.C. 989, 998 (1975). Ruf has provided evidence in the form of the Mulholland Stock Purchase Agreement and in his testimony that the Neiman-Reed note was delivered in 1986. Respondent has not asserted any additional deficiency in 1986 or any evidence of the earnings and profits for 1986 or of the fair market value of the Neiman-Reed note at the time of the distribution. We concur with the Rufs that the raising of section 304(a) is *114 a new matter that would require the hearing of new evidence and that respondent would bear the burden of proof. Rule 142(a). We are not persuaded by the Rufs' recharacterization of the distribution as a loan to Ruf or constructive dividend to the Neiman-Reed shareholders or by respondent's depiction of the distribution as a constructive dividend. We therefore hold that the transfer of the Mulholland stock from Ruf to Neiman-Reed was an installment sale as reported by the Rufs on their 1986 return and that the $ 789,453 received by Ruf in 1987 is the proceeds of such sale and should be taxed as such. Lumber City Consulting Fees
Neiman-Reed claimed deductions from 1980 through 1986 for payments it made to UBM and to the Sniders under their respective consultant agreements. Respondent contends that such payments were not deductible and that they were actually constructive dividends paid to UBM (51-percent owner of Neiman-Reed) and to the Sniders (16.6-percent owners of Neiman-Reed) in their capacities as shareholders. Section 162(a) allows deductions for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including *115 -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered". If the corporation is closely held and the persons receiving the compensation are shareholders, the payments are subject to close scrutiny to determine whether the alleged compensation is in fact a distribution of profits. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding on other grounds T.C. Memo. 1980-282. Whether an expense claimed pursuant to section 162(a) is compensation for services rather than a distribution of profits is a question of fact that must be decided on the basis of the particular facts and circumstances. Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). Under section 1.162-7(a), Income Tax Regs., the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." The regulations further provide that: An ostensible salary paid by a corporation *116 may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * [Sec. 1.162-7(b)(1), Income Tax Regs.]
The burden is on Lumber City to prove that (1) the payments were reasonable and (2) the payments were for services actually rendered. Rule 142(a). Lumber City argues that the payments were not dividends because (1) no payments were made to Neiman or Reed so that the payments to UBM and the Sniders were not proportionate to their stockholdings in Neiman-Reed and therefore not with respect to their stock as required by section 301(a) and (2) even if they were proportionate, services were actually rendered to Neiman-Reed and the payments were therefore reasonable. Respondent contends that (1) the payments can *117 be dividends even if not strictly in proportion to stockholdings in Neiman-Reed, (2) the amount of the consulting fee payments was determined with respect to insurance premiums paid on behalf of Neiman and Reed and the relative stockholdings of the shareholders, not with respect to services rendered, and (3) the services provided by UBM and the Sniders were not "helpful" to Neiman-Reed. Because the first two arguments are dispositive, we need not address the third issue of the "helpfulness" of the services provided. Lumber City relies on Bank of Stockton v. Commissioner, T.C. Memo. 1977-24, for the proposition that the lack of proportionality of payments to percentage of stock ownership may indicate nondividend character. Nonetheless, the law is well settled that a distribution of corporate earnings to shareholders may constitute a dividend, notwithstanding that it is not in proportion to stockholdings. Dellinger v. Commissioner, 32 T.C. 1178, 1183 (1959). Therefore, regardless of direct proportionality, we inquire whether the payments were with respect to stock rather than reasonable compensation for services actually *118 rendered. Sec. 301(a). Respondent has presented the following evidence to show that the consulting fees were tied to the relative amount of stock held by each shareholder and profits, not to the value of services provided or the amounts specified in the consultant agreements: (1) Letters from Howard M. Koff, an insurance salesman of HMK Financial, to Neiman-Reed explicitly relating the consulting fees to payment of insurance premiums on behalf of Neiman and Reed; (2) a letter from Pinnington, chief executive officer of UBM, to Neiman-Reed's then president Neiman, that discusses making the profits of Neiman-Reed available to UBM through management charges; (3) an interoffice memorandum of Neiman-Reed referring to the Neiman insurance premiums as "Neiman's consultancy fees" and relating such "fees" to the consulting fees for UBM and the Sniders and to proportion of stock ownership in Neiman-Reed; and finally (4) a telex from Cooper to UBM, explicitly relating the consulting fees to payments made to Neiman and holdings in Neiman-Reed. These documents demonstrate that Neiman-Reed was using various types of payments to distribute profits according to stock ownership. Lumber City has *119 failed to present any evidence to rebut inferences drawn from these documents. Lumber City claims that the insurance payments that benefited Neiman and Reed were compensation for services and that Neiman-Reed intended to provide the other stockholders with "similar compensation payments for services rendered." Lumber City must show that the payments made were reasonable payments based upon services provided, not based upon the compensation of the other shareholders. Because the evidence shows that the amounts of the payments were predicated upon the corporation's profits and the percentage of ownership in the corporation, Lumber City has not dissuaded us that the payments were actually with respect to the "consultants'" stock. Lumber City relies on section 1.162-7(b)(1), Income Tax Regs., for the argument that, even if payments are in proportion to stock ownership, they are only improper if in excess of what is usually paid for similar services. Lumber City offered the following as evidence of substantial services performed: (a) UBM sent several people to Neiman-Reed in various capacities to, among other things, search for a replacement for Reed and to get Neiman-Reed's "financial *120 paperwork in the form UBM wanted"; (b) Neiman-Reed provided a separate $ 60,000 annual reimbursement for Munro, a UBM employee who came to Neiman-Reed in 1983 as a full-time consultant; (c) the Sniders possessed specialized knowledge and expertise that were valuable to Neiman-Reed; and (d) the Sniders and UBM personnel attended board meetings. (None of the other shareholders were compensated for sitting on the board of directors or for attending board meetings.) Lumber City has not presented any specific evidence as to how many hours, days, weeks, or months were worked to earn the consulting fees. Lumber City argues that, under Yelencsics v. Commissioner, 74 T.C. 1513 (1980), an individual's right to receive payment under a consulting agreement is not contingent upon the performance of specific services or devoting prescribed hours in a consulting capacity. Nevertheless, the question remains as to how to determine a reasonable fee under the consultant agreements. Lumber City has not provided any evidence as to what similar companies would have paid for similar services. Such evidence is a significant factor in unreasonable compensation cases. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1330 (5th Cir. 1987), *121 affg. T.C. Memo. 1985-267. Lumber City has presented only testimony of past shareholders and directors of Neiman-Reed. Neiman testified that the company had "a devil of a time determining how much to pay" UBM and the Sniders, that the Sniders "were a tremendous asset to" Neiman-Reed, and that the amount paid to the Sniders was "one heck of a bargain". Thornton Snider testified that the consulting fees were "peanuts" compared to the amount of work done. Cooper, Neiman-Reed's attorney and director and co-trustee for Reed's estate, testified that the payments were actually consulting fees. Even if services were provided to Neiman-Reed, the evidence does not establish whether they were services that merited the consulting fees that were paid or they were services merely provided to protect or enhance the shareholders' respective investments in the company. See Olton Feed Yard, Inc. v. United States, 592 F.2d 272 (5th Cir. 1979). There is no evidence in the record to support a finding of a reasonable value for the consulting fees. The lack of arm's-length dealing between the parties and the absence of other evidence prevent *122 any allowance for payment of such fees. We decline to accept Lumber City's general assertions without further supporting evidence of the value of the services provided. We have considered the other arguments of the parties, and they are either without merit or need not be discussed in view of our resolution of the issues. For the foregoing reasons, we uphold respondent's disallowance of deductions for the consulting fees. Additions to Tax
Respondent asserts negligence on certain of the deficiencies in both of these consolidated cases. Respondent's determination that an underpayment is due to negligence is "presumptively correct and must stand unless the taxpayer can establish that he was not negligent." Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). Sections 6653(a)(1) (regarding additions to tax for 1985) and 6653(a)(1)(A) (regarding additions to tax for 1987) impose an addition to tax equal to *123 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. Sections 6653(a)(2) (for 1985) and 6653(a)(1)(B) (for 1987) provide for a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. For purposes of section 6653(a), "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). Generally, the duty of filing accurate returns cannot be avoided by placing the responsibility on a return preparer. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). However, in limited situations, taxpayers can avoid the negligence addition to tax if they have furnished all of the relevant information to a tax preparer and relied on that person's professional advice as to the proper tax treatment. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), *124 affd. 864 F.2d 1521 (10th Cir. 1989); Daugherty v. Commissioner, 78 T.C. 623, 641 (1982); Magill v. Commissioner, 70 T.C. 465, 479 (1978), affd. 651 F.2d 1233 (6th Cir. 1981); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). See also United States v. Boyle, 469 U.S. 241, 251 (1985). Here, the Rufs claim that they relied on Simon, a C.P.A., and supplied to him all relevant information to prepare their tax returns for the years in issue. Simon did not appear or testify at trial. The Court does not know what information or documents the Rufs provided to him. The Rufs have presented evidence that Simon was aware of the transfer of the Mulholland stock. However, the Rufs have not presented evidence to show that they furnished information to Simon, or any other tax expert, with respect to the treatment of the $ 789,453 distribution before filing their 1987 return. Under these circumstances, the Rufs have not proven that they sought the advice of, or reasonably relied upon, a tax expert with respect to their *125 failure to include the amount of the distribution on their 1987 return. Thus, we conclude that, for purposes of 6653(a)(1) the Rufs were negligent in excluding from their 1987 return the $ 789,453 proceeds from the sale of the Mulholland stock. The Rufs argue that Ruf was not negligent in failing to include the difference between the purchase price and the fair market value of the Odessa property as a dividend from Neiman-Reed to Ruf on their 1987 return. Respondent determined that the $ 1.5 million paid by Ruf for the Odessa property was less than the fair market value. The Rufs claim that the value of the property to Ruf was decreased because of the owner's obligation to lease the property to Neiman-Reed, which, according to the Rufs, was in poor financial condition at the time of the sale. The Rufs also contend that the property was discounted because no broker's fee was involved in the sale. They have not presented any evidence that Neiman-Reed was in poor financial shape or of the proper amount of any discount. In addition, respondent points out that Ruf, as sole owner of both Neiman-Reed and the Odessa property, presumably could have canceled the lease if he so desired. *126 Most significantly, the Rufs have not explained how they arrived at the purchase price, which was $ 800,000, or over one-third, less than the $ 2.3 million lowest price acceptable to the corporation 1 year earlier. Thus, we sustain respondent's determination that the Rufs are liable for the additions to tax under section 6653(a)(1)(A) and (B) on the entire deficiency for 1987. Section 6661 provides for an addition to tax equal to 25 percent of the underpayment of tax attributable to a substantial understatement of income tax. Sec. 6661(a). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). An understatement is substantial for a corporation (other than an S corporation or personal holding company) if the amount of the understatement exceeds the greater of 10 percent of the tax due or $ 10,000. Sec. 6661(b)(1)(B). The section 6661 addition to tax is inapplicable, however, if there was substantial authority for the taxpayer's treatment of the items in issue or if the relevant facts relating to the tax treatment were adequately disclosed on the return. Sec. 6661(b)(2)(B)(i) and *127 (ii). The Rufs substantially underreported taxable income on their tax return for 1987. The Rufs argue that there was substantial authority for the treatment they used on their returns with respect to both the Mulholland stock transfer and the Odessa property transaction. There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions. Accardo v. Commissioner, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990); sec. 1.6661-3(b), Income Tax Regs. The Rufs contend that the substance over form and the step-transaction doctrines were substantial authority for not reporting the $ 789,453 distribution on their 1987 return. As we have previously concluded, we do not find that either of these doctrines supports construing the distribution as a loan. Because the factual contexts in which they have been applied are not comparable to those involved here, the cases cited by the Rufs do not constitute substantial authority. Antonides v. Commissioner, 91 T.C. 686, 703 (1988), *128 affd. 893 F.2d 656 (4th Cir. 1990). Further, there was not adequate disclosure on the Rufs' 1987 return regarding the Mulholland stock transfer or the Odessa property transaction. We conclude that the Rufs are liable for the additions to tax under section 6661 on the entire understatement for 1987. The Rufs further contend that the Commissioner should have granted them a waiver of the section 6661 addition to tax. Section 6661(c) authorizes the Commissioner to waive any part of the addition to tax imposed under section 6661 on a showing that (1) there was reasonable cause for the understatement and (2) the taxpayer acted in good faith. The denial of a waiver under section 6661(c) is reviewable by the Court on an abuse-of-discretion basis. Mailman v. Commissioner, 91 T.C. 1079, 1082-1084 (1988). The most important factor in determining reasonable cause and good faith under section 6661(c) is "the extent of the taxpayer's effort to assess [his] proper tax liability under the law." Mailman v. Commissioner, supra at 1084; sec. 1.6661-6(b), Income Tax Regs. Reliance on the advice of an *129 attorney or accountant constitutes a showing of reasonable cause and good faith under section 6661(c) only if, "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6661-6(b), Income Tax Regs. The Rufs have presented evidence that they sought the advice of their accountant and attorney to characterize the stock transfer. It is not clear whether the Rufs sought advice on the treatment of the $ 789,453 distribution until after they knew that an audit had commenced. Nor is it clear what information or documents the Rufs provided to their advisors. There is no indication that the Rufs made an effort to determine their proper tax liability with respect to the Odessa property transaction. In any event, the statute provides that respondent "may waive all or any part of the addition to tax". Sec. 6661(c); emphasis added. Thus, the Rufs must make a showing of reasonable cause and good faith that is so clear that respondent's refusal is arbitrary, capricious, or without sound basis in fact. Mailman v. Commissioner, supra at 1084. Under the present circumstances of Ruf's failing to declare his receipt *130 of the $ 789,453, which distribution reasonably appeared to consist of sale proceeds, and of Ruf's purchase of the Odessa property for below market value, we cannot say that respondent abused her discretion in denying a waiver. Lumber City argues against the additions to tax for negligence and substantial understatement for 1985 and 1987 on the basis that all of the consulting fees deducted by Lumber City were reasonable and for services rendered. Lumber City has failed to meet its burden of proving that it was not negligent with respect to any of the amounts for which respondent has imposed additions to tax. We sustain respondent's determination with respect to Lumber City as to the additions to tax under section 6653 for 1985 and 1987 and under section 6661 for 1985. We sustain respondent's determination as to the additions to tax under section 6661 for 1987, assuming that the recomputation under Rule 155 results in a substantial understatement for that year. Decisions will be entered under Rule 155. Footnotes
1. The $ 60,000 and $ 5,000 paid for Munro in the years ended Feb. 1985 and Feb. 1986, respectively, were paid directly to UBM.↩