ROBERT S. GROETZINGER AND BEVERLY L. GROETZINGER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 562-82.          Filed August 26, 1986.

---

Robert S. Groetzinger, pro se.
*Mark S. Priver*, for the respondent.

## OPINION

NIMS, *Judge*: Respondent determined deficiencies of $297 and $28,276.23 in petitioners' joint Federal income tax for 1977 and 1978, respectively. After concessions, two issues remain: (1) Whether petitioners, husband and wife, may disavow the form of the stock option provision within their employment contract so as to allocate the stock option proceeds between themselves for purposes of computing their section 911 foreign earned income exclusions;[1] and (2) whether petitioners may attribute any income from the 1978 disposition of the employee stock option to 1977 by virtue of the attribution rule of section 911(c)(2) (now section 911(b)(2)(B)).

This case has been submitted fully stipulated. The evidence consists of a stipulation of facts with attached exhibits which is incorporated herein by this reference.

Robert S. Groetzinger and Beverly Groetzinger (hereinafter referred to as petitioners, collectively, or Robert and Beverly, individually) were married and residents of Fribourg, Switzerland, at the time the petition was filed in this case, and were bona fide residents of a foreign country at all times during the taxable years in issue, 1977 and

---

[1]Unless otherwise indicated, all section references are to sections of the Internal Revenue Code of 1954 in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

1978. Petitioners were employees of American Telecommunications Corp. (ATC), a California corporation, during the tax years in question pursuant to a written, joint employment contract between petitioners and ATC. The parties executed the agreement on November 1, 1976. The terms of the agreement are set forth in an 8-paragraph instrument.

Paragraph 1 of the instrument[2] essentially provides for the employment of Robert and Beverly with American Telecommunications S.A. (ATSA), a subsidiary of ATC in Fribourg, Switzerland. Paragraph 1 also specifies the employment title and salary of Robert and Beverly. Robert was to be employed as President of ATSA at a annual salary of $16,000 and Beverly as an administrative secretary at an annual salary of $8,000.

Paragraph 2 sets forth the terms of the employee stock option.[3] This paragraph refers to "R.S. GROETZINGER" as the optionee. The paragraph describes the contingencies, the

---

[2] Par. 1 of the employment contract provides in relevant part:

"Mr. R.S. GROETZINGER will be employed as President of ATC's subsidiary company in Fribourg Switzerland, AMERICAN TELECOMMUNICATIONS S.A. ('ATSA') at a salary of $16,000 per year. BEVERLY L. GROETZINGER, his wife, will be employed as administrative secretary of ATSA at a salary of $8,000 per year. During the period of employment of Mr. GROETZINGER by ATSA, MANAGEMENT AND FINANCE S.A., of Fribourg Switzerland ('MAFSA') will be paid a consulting fee of $6,000 per year. * * *"

[3] Par. 2 of the employment contract provides:

"Subject to ATC Board of Directors' approval and further subject to and contingent upon the validity and operability under applicable laws and regulations, it is intended that Mr. R.S. GROETZINGER will receive a stock option in two parts.

"A. 8,000 shares of a normal ATC stock option based on a plan to be initially presented at the next ATC board meeting. This plan will allow R.S. GROETZINGER to exercise 20% of the shares during each year of his employment for five years at the market price prevailing at the time the option is initially granted by the ATC board.

"B. Up to 10,000 additional shares on terms similar to the normal ATC stock option will be made available at market price at the date of the initial grant by the ATC board on the following basis if Mr. GROETZINGER is then still employed by ATSA: If on May 1, 1979, the cumulative sales of ATSA will have been $4,576,981 or more, Mr. GROETZINGER will be able to exercise an option for 687 shares. If on May 1, 1980, the cumulative sales of ATSA will have been $9,607,448 or more, Mr. GROETZINGER will be able to exercise an option for 1,226 additional shares. If, for any reason, the 687 shares scheduled for the previous year were not exercised, he may then also exercise those shares. If on May 1, 1981, the cumulative sales of ATSA will have been $18,578,929 or more, Mr. GROETZINGER will be able then to exercise an option for 2,187 additional shares. In addition, he may exercise his option for the shares which he would have been eligible for at May 1, 1979, and May 1, 1980, if he did not exercise those options at that time. If on May 1, 1982, the cumulative sales of ATSA will have been $34,578,929 or more, Mr. GROETZINGER will be able to exercise an option for 3,900 additional shares. In addition, he may then exercise his option for the shares which he would have been eligible for during the three previous years. Also in addition, on May 1, 1982, if the cumulative sales are greater than that figure ($34,578,929), he may exercise an option for one additional share for each $4,322.37 of sales over that total to a maximum of 2,000 additional shares."

quantities of shares, and the dates upon which Robert could exercise the option. Paragraph 2 makes no explicit or implicit reference to Beverly.

Paragraphs 3 through 8 set forth further incidents of employment.[4] In each instance, these remaining paragraphs refer to petitioners collectively. Paragraph 8 provides in conclusion that the agreement as written would be construed and performance determined under California law and could not be amended except by an instrument executed by all of the parties.

On January 19, 1977, the board of directors of ATC formally granted to Robert a stock option on ATC stock pursuant to paragraph 2 of the employment contract.

Petitioners filed a joint individual income tax return for the calendar year 1977. On this return they reported gross income of $39,486.83. For purposes of the foreign earned income exclusion, Robert reported $20,009.60 and Beverly reported $10,004.80 of foreign earned income.

During 1978 Robert exercised his option on 10,000 shares of ATC stock.[5] On December 1, 1978, ATC transferred the 10,000 shares to Robert, who paid $40,000 for the lot. Robert sold the 10,000 ATC shares within the month for the sum of $235,000. This sum was deposited in petitioners'

---

[4] Pars. 3 through 8 of the employment contract provide in relevant part:

3. Mr. and Mrs. GROETZINGER will be immediately eligible for health insurance under ATC's normal Blue Cross plan. * * *

4. The employees have agreed to move their residence from London to Switzerland as soon as practicable and to there establish ATC's principal European operating headquarters. * * *

5. Special Overseas Benefit — Commencing in 1978 and each year thereafter in which both Mr. and Mrs. GROETZINGER are employed by ATSA, ATC agrees to reimburse them for the cost of economy airfare from Europe to the U.S.A. for the purpose of annual home leave. * * *

6(a) Unless sooner terminated for cause by either party, or except as provided in (b) below, this agreement will be effective for three (3) years commencing on November 1, 1976.

(b) Either party may terminate this Agreement at any time upon one (1) year's written notice. It is expressly agreed by R. S. GROETZINGER and by B. L. GROETZINGER that they have accepted this provision for termination by ATC on one year's notice * * *

7. It is contemplated and agreed to by the parties that this Agreement may be assigned by ATC to ATSA at some time in the future, at ATC's option.

8. Miscellaneous

A. This Agreement will be construed and performance determined in accordance with the laws of the State of California, U.S.A.

B. This Agreement constitutes the entire agreement related to the employment of R.S. GROETZINGER and B.L. GROETZINGER by ATC and/or by ATSA and shall not be varied, amended or supplemented except by an instrument in writing executed by all the parties * * *

[5] The record does not reveal how Robert in 1978 could exercise the option on 10,000 shares of ATC stock within the terms of the stock option plan as provided in par. 2 of the employment contract.

joint bank account on December 11, 1978. The gain amounted to $195,000.

Petitioners filed a joint individual income tax return for the calendar year 1978. On this return they reported gross income of $146,850. Robert reported $125,594 in foreign earned income, which consisted of $97,500, or half of the gain, from the disposition of the employee stock option and $28,094 in salary. Beverly reported $10,747 in foreign earned income, which consisted of her ATSA salary alone. Under section 911, Robert and Beverly excluded $15,000 and $10,747, respectively, of their foreign earned income. On Form 3921 of petitioners' 1978 return, they described the option exercised as a restricted stock option within the meaning of section 424(b) and Robert as the person to whom the optionor ATC transferred the stock. Petitioners consistently described in their returns Robert's occupation as businessman and Beverly's as corporate secretary.

In 1979 and 1980, petitioners filed two amendments to their 1977 tax return and one amendment to their 1978 return. Essentially, petitioners' amendments to their 1977 and 1978 tax returns reallocated the gain from the 1978 disposition of ATC stock first, between petitioners' taxable years 1977 and 1978 and second, between Robert and Beverly for 1978 for purposes of computing their foreign earned income exclusions.

## Issue 1

The first issue for decision is whether the proceeds from the stock option, which ATC explicitly granted to Robert, are divisible between Robert and Beverly for purposes of the foreign earned income exclusion provided in section 911. The resolution of this issue turns on whether petitioners may disavow the form of the employment contract pursuant to which the stock option was granted on the theory that the instrument did not represent the substance of the agreement.

Section 911,[6] for the tax years in issue, permits an individual citizen of the United States who establishes

---

[6] For 1977 sec. 911 provided in relevant part:

SEC. 911(a). GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

either bona fide residency in a foreign country or physical presence in such country for 17 months during a consecutive 18-month period to exclude certain earned income from foreign sources during the qualifying period. For 1978,

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

*    *    *    *    *    *    *

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. * * *

(c) SPECIAL RULES.—For purposes of computing the amount excludable under subsection (a), the following rules shall apply:

(1) LIMITATIONS ON AMOUNT OF EXCLUSION.—The amount excluded from the gross income of an individual under subsection (a) for any taxable year shall not exceed an amount which shall be computed on a daily basis at an annual rate of—

(A) except as provided in subparagraph (B), $20,000 in the case of an individual who qualifies under subsection (a), or

(B) $25,000 in the case of an individual who qualifies under subsection (a)(1), but only with respect to that portion of such taxable year occurring after such individual has been a bona fide resident of a foreign country or countries for an uninterrupted period of 3 consecutive years.

(2) ATTRIBUTION TO YEAR IN WHICH SERVICES ARE PERFORMED.—For purposes of applying paragraph (1), amounts received shall be considered received in the taxable year in which the services to which the amounts are attributable are performed.

(3) TREATMENT OF COMMUNITY INCOME.—In applying paragraph (1) with respect to amounts received for services performed by a husband or wife which are community income under community property laws applicable to such income, the aggregate amount excludable under subsection (a) from the gross income of such husband and wife shall equal the amount which would be excludable if such amounts did not constitute such community income.

Congress revised much of sec. 911 for tax years beginning in 1978 under the Tax Treatment Extension Act of 1977, Pub. L. 95-615, sec. 202, 92 Stat. 3098 (act). Under the act's transition rule, however, taxpayers could elect for 1978 to apply sec. 911 as it existed for 1977, subject to a $15,000 limitation. Pub. L. 95-615, sec. 209, 92 Stat. 3109.

Congress initially enacted the $15,000 limitation under sec. 911(c)(1) effective for tax years beginning in 1976. Tax Reform Act of 1976, Pub. L. 94-455, sec. 1011(a), 90 Stat. 1610. Under subsequent amendments, however, Congress postponed the effective date of the $15,000 limitation until tax years beginning in 1978. See Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, sec. 302, 91 Stat. 152; Tax Treatment Extension Act of 1977, Pub. L. 95-615, sec. 4(a), 92 Stat. 3097.

qualified taxpayers could elect to exclude a maximum of $15,000 for a complete tax year of foreign residence. When qualifying taxpayers are husband and wife, and both reside abroad and earn income abroad, separate ceilings apply to their earnings attributable to the services of each, even though the income is community income. Sec. 911(c)(3).

On brief, petitioners argue that for 1978, Beverly is entitled to the maximum exclusion under section 911(c)(l). The argument is predicated on their assertion that although in form the gain from the ATC stock disposition is allocable to Robert, alone, in substance the gain is allocable to both Beverly and Robert. Thus, under such allocation, Beverly's foreign earned income is sufficiently high to allow for the maximum exclusion.

In arguing substance over form, petitioners address the economic reality of the employment agreement and the intention of the parties to the agreement. Petitioners contend that in economic reality the sales-related contingencies regarding the rights to exercise the stock option were achieved only by the services of both Beverly and Robert. According to petitioners on brief, "[Robert] would never have received *his* share of the proceeds without *her* participation." (Emphasis of petitioners.) They assert that the deposit of the proceeds in their joint bank account is objective evidence that in economic reality both received the income. Petitioners also contend that the parties to the agreement intended the stock option to apply to both Robert and Beverly. Petitioners explain that "the stock option was issued only in the name of [Robert] solely for reasons of administrative facility and simplicity."

On brief, respondent makes two arguments against any allocation of gains to Beverly.[7] First, he contends that "it would defy reason" to believe the parties intended anything other than the form in which the agreement was cast because its terms are "so clearly and unmistakably described." Second, respondent argues that the stock option involved herein constitutes a section 424 restricted stock option, and to permit the transfer of ATC shares to anyone

---

[7] Respondent does not dispute that the entire gain from the disposition of ATC stock constitutes "earned income" within the meaning of sec. 911(b).

other than Robert would contradict the restrictive nature and purpose of section 424.

We agree with respondent's determination, although with regard to his first contention we would be reluctant to bind petitioners to the form of their agreement solely on the ground that the form is clearly described. See *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252 (1939); *Landa v. Commissioner*, 206 F.2d 431, 432 (D.C. Cir. 1953), revg. a Memorandum Opinion of this Court; *Ciaio v. Commissioner*, 47 T.C. 447, 457 (1967). Before proceeding with our reasons for deciding this issue for respondent, we pause to observe that respondent's second contention is clearly erroneous because the stock option involved herein cannot constitute a section 424 stock option by definition. According to sections 424(b) and 424(c)(3), a statutory "restricted stock option" must be granted before 1964, or later if pursuant to a binding contract made before 1964 or a written plan adopted and approved before 1964. By contrast, ATC granted Robert the stock option involved herein on January 19, 1977, pursuant to a November 1976, employment contract.

The Commissioner's determinations, however, are presumptively correct, and petitioners bear the burden of disproving his adjustments. Rule 142(a). In cases such as the one sub judice, where the taxpayer seeks to avoid the form of his own agreement, a higher level of proof, known as the "strong proof standard," often is required in order for him to carry his burden. See *Coleman v. Commissioner*, 87 T.C. 178 (1986); *Major v. Commissioner*, 76 T.C. 239, 247 (1981); *Lucas v. Commissioner*, 58 T.C. 1022, 1032 (1972).[8] We find it unnecessary to determine whether this higher standard of proof is applicable to this case, for after a careful survey of the facts before us we are convinced that the petitioner has failed to disprove by a preponderance of evidence the Commissioner's determinations.

---

[8] Most of the "strong proof standard" cases involve potentially conflicting claims among taxpayers, including disputes over partial allocations of sale prices to covenants not to compete. See *Major v. Commissioner*, 76 T.C. 239, 246 (1981); *Lazisky v. Commissioner*, 72 T.C. 495, 500-502 (1979), affd. sub nom. *Magnolia Surf, Inc. v. Commissioner*, 636 F.2d 11 (1st Cir. 1980). But see *Coleman v. Commissioner*, 87 T.C. 178 (1986); *Mittleman v. Commissioner*, 56 T.C. 171, 175 (1971), affd. per curiam 464 F.2d 1393 (3d Cir. 1972).

Under the doctrine of substance over form, the objective economic realities, rather than the particular form in which the agreement was cast, govern the tax consequences of the agreement. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Gregory v. Helvering*, 293 U.S. 465 (1935). Under certain circumstances, a taxpayer may be entitled to argue substance over form in a transaction (*Helvering v. F. & R. Lazarus & Co.*, *supra*; *Ciaio v. Commissioner*, *supra* at 457), although petitioner must provide objective evidence that the substance of the transaction was in accord with the position argued by petitioner rather than the form set forth by all the relevant documents. *Gulf Oil Co v. Commissioner*, 86 T.C. 937 (1986); *Yamamoto v. Commissioner*, 73 T.C. 946, 954 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982). Moreover, it is axiomatic that:

while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not. * * * [*Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974).[9]

We are convinced that the rule of *National Alfalfa* accurately addresses the situation presented herein. ATC and petitioners were free to structure the employment agreement, including the stock option provision, to their tax advantage. The record clearly establishes, and the petitioners do not dispute, that the employment agreement in form provided that ATC would grant the incentive stock option to Robert, alone. Under paragraph 2 of the agreement, the parties explicitly provided that Robert, rather than both Robert and Beverly, would be entitled to the stock option. The omission of Beverly's name in paragraph 2 is particularly obvious in the context of each of the remaining paragraphs, which refer to petitioners, collectively. In addition, the parties stressed in paragraph 8 of their instrument that the instrument represented the final embodiment of the agreement. In ascertaining the deliberateness of this form we look to the acts of the parties and the documentation surrounding the agreement unless we are given evidence to the contrary. *Yamamoto v. Commissioner*, *supra* at 954. The

---

[9] See *Treister v. Commissioner*, T.C. Memo. 1986-53.

objective acts and documentation indicate the parties subsequently abided by the agreement as they made it. Both petitioners and respondent agree that ATC formally granted the option to Robert alone pursuant to the agreement and that Robert himself exercised this option. In addition, petitioners document in their 1978 return that ATC transferred the shares to Robert in his name, alone.

The petitioners understandingly elected to structure the stock option in the form of compensation for Robert, alone, and abided by the agreement as they made it. Following the principle of *National Alfalfa*, we find that petitioners must accept the tax consequences of their structural choice.

We reject petitioners' argument that the substance of the agreement, including the economic realities and underlying intent, differs from its form. In applying the substance-over-form doctrine we are concerned with the intentions at the time of the agreement and economic realities as then perceived by the participants. We are not called upon to restructure the transaction with the benefit of hindsight, for the nature of the stock option depends upon the agreement when entered into, and not upon subsequent action or inaction by the parties. See *Yamamoto v. Commissioner*, *supra* at 954; *Barrett v. Commissioner*, 58 T.C. 284, 289 (1972).[10] As such, we are not concerned with petitioners' hindsight perspective of the agreement's potential tax benefits as well as their contention that Beverly's services helped ATSA achieve various sales quotas upon which Robert's exercise powers were contingent, or with such subsequent actions as the deposit of the proceeds from petitioners' sale of ATC stock into their joint account.

By focusing on the substance of the agreement at the time the parties made it, we are convinced that the form of the stock option was imbued with economic reality. In making this factual determination, we look to the nature of this compensatory provision vis-a-vis the nature of services which each petitioner as employee performed. ATC structured the stock option essentially as a sales incentive. That is, Robert's exercise of the option was contingent upon ATSA's achievement of various sales goals as well as Robert's continuity of employment. In light of Robert's

---

[10] See also *Import Specialties, Inc. v. Commissioner*, T.C. Memo. 1982-41.

status as president of ATSA and self-description as "Businessman," we reasonably assume that Robert had a direct impact on ATSA's volume of sales. Petitioners provide no objective evidence that Beverly, in her capacity as administrative secretary, had more than an indirect effect on ATSA's sales volume or that her position was by nature sales-oriented. We are concerned not with Beverly's title as "Administrative Secretary," but rather with her role as perceived by the parties to the agreement when executed. The surrounding facts, including petitioners' documentation on various returns, suggest her role was purely that of secretary and assistant. In consideration of the sales-oriented nature of the incentive stock option, we find it plausible that the form of the incentive stock option, applicable to Robert, alone, was imbued with economic reality.

In petitioners' remaining contention as to the substance of the agreement, they argue that the parties to the agreement actually intended to allocate the stock option between Robert and Beverly. We find this argument unconvincing for two reasons. First, their argument is self-defeating. Petitioners explained that the stock option was structured as it was because the parties to the agreement intended to employ an administratively convenient form. Faced with competing intentions and the choice of tax benefits versus administrative simplicity, petitioners opted for simplicity, and they must accept the tax consequences. It is this type of deliberate choice of one form over another to which the Court in *National Alfalfa* speaks.

Second, petitioners present no objective evidence that the parties to the contract specifically intended when the instrument was executed to allocate the stock option between Robert and Beverly. When an agreement in form is objectively void of any apportionment of the consideration which taxpayer is to receive, taxpayer's unilateral self-serving apportionment of the consideration is not binding upon the Commissioner. Accord *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 682 (5th Cir. 1971) (involving purchaser's unilateral allocation of goodwill to amortizable assets); *Blackstone Realty Co. v. Commissioner*, 398 F.2d 991, 997 (5th Cir. 1968), affg. a Memorandum

Opinion of this Court (involving seller's unilateral valuation of certain component parts of sale). Petitioners present no objective evidence that the parties to the agreement intended to allocate quantitatively part of the option to Beverly, rather than merely to benefit her in a community property sense by compensating her spouse. Therefore, we reject petitioners' argument that their unilateral, self-serving allocation in their amended 1978 return of the stock option proceeds between Robert and Beverly is binding upon the Commissioner.

We hold that the substance of the stock option provision within the employment contract coincided with its form. Consequently, we agree with respondent that Robert, alone, is entitled to report the gain from the disposition of the stock option as earned income for purposes of computing the section 911 exclusion.

## Issue 2

The second issue for decision is whether petitioners may attribute any gain from the 1978 disposition of the employee stock option to 1977 under the attribution rule of section 911(c)(2) (now section 911(b)(2)(B)).

On brief, petitioners argue that the proceeds from the sale of the ATC shares "must be equally divided over the years 1977 and 1978 for income tax purposes." According to petitioners, section 911(c)(2) permits their attribution of the proceeds from the stock option to the years in which Robert earned the right to exercise the option. Petitioners assert they earned those rights by their performance of services over the 2-year period of 1977-78, and are entitled to report the proceeds as such.

Respondent argues that petitioners must report the gain entirely in 1978. He relies on the application of the disqualifying disposition provisions of section 421(b)[11] and

---

[11] Sec. 421(b) provides in pertinent part:

SEC. 421(b). EFFECT OF DISQUALIFYING DISPOSITION.—If the transfer of a share of stock to an individual pursuant to his exercise of an option would otherwise meet the requirements of section * * * 424(a) except that there is a failure to meet any of the holding period requirements of section * * * 424(a)(1), then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occured.

section 1.421-8(b)(1), Income Tax Regs., which require recognition of gain in the year of disposition. Respondent contends that Robert's exercise of the stock option and disposition of the ATC shares prior to the end of the 2-year holding period constituted a disqualifying disposition of a restricted stock option. As such, he contends petitioners must report the entire gain in the year of the disposition, i.e., 1978. Respondent concludes that this "mandate" as to the time for reporting the gain precludes petitioners from any attribution of gain to the year in which it was earned within the authority of section 911(c)(2).

Respondent attempts to buttress his argument by tracing the legislative history of the attribution rule.[12] According to respondent, Congress intended the attribution rule of section 911(c)(2) to apply to such income items as salaries and profit-related bonuses paid after the closing of the taxable year. By contrast, respondent asserts most forms of deferred compensation are ineligible for the foreign earned income exclusion by virtue of section 911(c)(4) (now section 911(b)(1)(B)(iv)).

We reject respondent's arguments; however, we find that petitioners have satisfied their burden of proof only in part. Respondent's argument that petitioners must report income from a disqualifying disposition of a section 424 restricted stock option in the year of disposition serves no purpose in this case, for section 424 is inapplicable here by virtue of the dates on which ATC proposed and granted the option.[13] See secs. 424(b), 424(c)(3). Moreover, respondent's references to the legislative history of sections 911(c)(2) and 911(c)(4) carry little weight with regard to whether petitioners may attribute part of the gain to the taxable year 1977. Respondent shows no trace of congressional intent to preclude the application of section 911(c)(2) to such foreign earned income as exists here. Although section 911(c)(4) may preclude "most deferred compensation" from the

_____

[12] Respondent cites S. Rept. 1881, 87th Cong., 2d Sess. 74, 77 (1962), 1962-3 C.B. 707, 783; H. Rept. 1447, 87th Cong., 2d Sess. 54, 56 (1962), 1962-3 C.B. 405, 459-460.

[13] We remind respondent of his ruling that income from the disqualifying disposition of a statutory employee stock option may constitute excludable foreign earned income under sec. 911. Rev. Rul. 69-118, 1969-1 C.B. 135. According to the ruling, the special rules of sec. 911(c), including the attribution of earned income to the period during which the services were performed, govern the reporting of this foreign earned income. Rev. Rul 69-118, *supra*, 1969-1 C.B. at 136.

exclusion, that provision is inapplicable to the earned income in this case. Section 911(c)(4) explicitly precludes "amount[s] received after the close of the taxable year following the taxable year in which the services to which the amounts are attributable are performed." Robert received the stock option proceeds involved herein, by contrast, within the taxable year after the services were performed.

Nevertheless, section 911(c)(2) does not necessarily permit taxpayers to exclude all of their foreign earned income attributable to the year in which the underlying services were performed. This is a consequence of the limitations on the amount of exclusion provided in section 911(c)(1). The attribution rule in effect puts a cash basis taxpayer on the accrual method of accounting exclusively for the purpose of calculating the section 911 exclusion, and does not affect the time of reporting foreign earned income that is includable in gross income. Section 911(c)(2) provides, *"For purposes of [computing the amount excludable under section 911]*, amounts received shall be considered received in the taxable year in which the services to which the amounts are attributable are performed." (Emphasis supplied.) Section 1.911-2(d)(1), Income Tax Regs., T.D. 6665, 1963-2 C.B. 27, applicable to the tax years in issue, dispels any possible vagueness as to the limited applicability of section 911(c)(2). Section 1.911-2(d)(1), Income Tax Regs., in relevant part provides:

(1) *Attribution to year in which services are performed.* (i) For purposes of applying paragraphs (a)(4) and (b)(2) of this section, amounts received * * * by an individual shall be considered received in his taxable year in which the services to which the amounts are attributable are performed by such individual.

(ii) The rule of subdivision (i) of this subparagraph *applies only to determine the total amounts attributable to any one year for the purpose of determining the amount of the exclusion* under paragraph (a)(4) or (b)(2) of this section and *does not affect the time of reporting of any amounts which are includible in the individual's gross income.* [Emphasis supplied.]

See *Cook v. United States*, 220 Ct. Cl. 76, 599 F.2d 400, 408 (1979). Needless to say, under section 911 petitioners may not attribute to 1977 any of the gain from the sale of ATC stock for purposes other than applying it against Robert's

$25,000 exclusion for 1977, regardless of when Robert performed the underlying services.

Having determined in issue 1 that the gain from the 1978 sale of ATC stock constitutes foreign earned income of Robert, alone, we find the real issue is whether petitioners may attribute any of the gain to 1977 for purposes of recomputing Robert's 1977 foreign earned income exclusion. Resolution of this issue turns on whether any amount of the gain is attributable to Robert's services performed in 1977 and, if so, whether any of such gain is excludable from 1977 gross income within the applicable section 911 dollar limitations.

We accept petitioners' contention that half of the $195,000 gain from the sale of ATC stock is attributable to services performed in 1977. Petitioners claim that the rights to exercise the stock option on the 10,000 shares of ATC stock were earned from services performed during 1977 and 1978. According to petitioners, half of the gain resulting from the sale of ATC shares is therefore attributable to services performed in 1977. Respondent did not dispute this assertion, and we conclude that respondent concedes this point.

From this part of the gain attributable to Robert's performance of services in 1977, we determine that $4,990.40 is excludable within the section 911 ceiling applicable to Robert for 1977. We compute this figure as follows. For tax years beginning in 1977, individuals who were bona fide residents of a foreign country for an uninterrupted period of 3 consecutive years were entitled to a maximum annual exclusion of $25,000. Sec. 911(c)(1)(B). In petitioners' amended 1977 return, they indicate, and respondent does not dispute, that Robert was such a bona fide resident. According to petitioners' 1977 tax return, Robert's foreign earned income, excluding the stock option proceeds attributable to 1977 services, amounted to $20,009.60. Petitioners are therefore entitled to attribute $4,990.40 of the gain from the 1978 sale of ATC stock to the taxable year 1977 for purposes of computing Robert's section 911 exclusion. To the extent such holding results in an overpayment for 1977, petitioners will be deemed to have amended their petition to request such overpayment. Petitioners may

not attribute any of the balance of the gain to 1977 for purposes of the section 911 exclusion.

---

As a final matter, we must deal with petitioners' motions for dismissal, filed July 15, 1985, and for the award of fees and costs, filed July 15, 1985. Petitioners based their motion for dismissal on events occurring entirely at the administrative level. In rejecting this motion, we remind petitioners, as we informed them during the hearing, that trials in the Tax Court are de novo. We must determine petitioners' tax liability based on the merits of the case and not on any previous record developed at the administrative level. *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327-328 (1974).

We also reject petitioners' motion for award of fees and costs pursuant to section 7430, which provides that reasonable litigation costs may be awarded to the prevailing party. Petitioners' motion, filed on the date of the hearing rather than after the service of the written opinion, does not comply with the provisions of Rule 231(a)(2) and is therefore denied.

To reflect the foregoing, as well as concessions,

> *An appropriate order will be issued and decision will be entered under Rule 155.*