T.C. Memo. 2007-369

UNITED STATES TAX COURT

J. RAMSAY FARAH AND ELIZABETH FARAH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23412-05.        Filed December 19, 2007.

<u>Jurist Bruce Howard</u>, for petitioners.

<u>Jay A. Roberts</u> and <u>Ann M. Welhaf</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined a deficiency in
petitioners' Federal income tax of $170,925 and a penalty under
section 6662(a) of $34,185, for 2001.[1]

---

[1]Unless otherwise indicated, section references are to the
Internal Revenue Code, as amended.  Rule references are to the
Tax Court Rules of Practice and Procedure.  Amounts are rounded
to the nearest dollar.

After concessions,[2] the issues for decision are: (1) Whether petitioners may exclude the gain on the sale of their Berlin home under section 121; (2) whether petitioners may also exclude the gain on the sale of the South Point Road lot under section 121; and (3) whether petitioners are liable for a penalty under section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the exhibits attached thereto, and the stipulation of settled issues are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Hagerstown, Maryland.

Background

In 1976, petitioner Dr. J. Ramsay Farah (Dr. Farah) opened his pediatric medical practice in Hagerstown, Maryland.[3] Over the years, petitioner Elizabeth Farah (Ms. Farah) also worked for the medical practice assisting with various administrative duties. However, she always worked from her home.

---

[2]Petitioners concede they are not entitled to a loss of $45,733 from their Schedule E, Supplemental Income and Loss, rental real estate activities, and they are not entitled to Schedule C, Profit or Loss From Business, deductions of $64,915. Petitioners also concede they failed to report State income tax refunds of $3,354.

[3]At various times from 1980 through 1998, Dr. Farah operated medical offices in Waynesboro, Pennsylvania, and Boonsboro, Maryland, in addition to his Hagerstown practice.

On November 13, 1976, Dr. Farah was appointed to the medical staff of Washington County Hospital in Hagerstown, Maryland. In May 1977, petitioners purchased a large, historic house located at 1003 The Terrace, Hagerstown, Maryland (Hagerstown house). At the time of trial in this case, petitioners still owned the Hagerstown house. Dr. Farah has always maintained an office in the Hagerstown house. Since 1980, he has used the Hagerstown address as the business address for his medical practice and myriad other business activities.

In addition to their work in the medical practice, since 1992, petitioners have been general partners in the Boonsboro Medical Center Partnership (Boonsboro Partnership), which owns and leases office space to various tenants including physicians. Dr. and Ms. Farah own a 71.74-percent and 1.74-percent interest in the Boonsboro Partnership, respectively.

The Purchase of the Berlin House and the South Point Road Lot

On October 18, 1989, petitioners purchased a piece of waterfront property consisting of 3.27 acres and a house located at 5922 South Point Road, Berlin, Maryland (Berlin house). Petitioners intended to use it as a summer home and eventually make it their retirement home.

The property was originally listed for sale for $399,000. However, the sellers accepted petitioners' offer of significantly less, either $315,000 as respondent contends or $365,000 as

petitioners contend.  The contract for sale lists the purchase price as $315,000.  The form HUD-1 settlement sheet issued at the closing also lists the total purchase price as $315,000.  An addendum to the contract provides that $50,000 is to be paid for "personal property not specifically included in the contract for purchase."  Petitioners executed a promissory note in the amount of $50,000 in favor of the sellers.  The note carried a term of 5 years and called for $5,000 of interest to be paid.

Over the years, petitioners made significant improvements to the Berlin house, costing a total of $274,375, to make it a suitable retirement home.  In addition to improving the house, petitioners required additional land for a yard and septic drainage field as most of the property surrounding the Berlin house was marshland.  To that end, petitioners planned to purchase the 2.39 acre unimproved lot adjacent to the Berlin house, known as Lot 1, Minor Subdivision of W.V. Krewatch Land, South Point Road Berlin, Maryland (South Point Road lot).

On April 6, 1991, on the advice of counsel, petitioners formed the J. Ramsay Farah Family Partnership (Family Partnership), a Maryland general partnership for the purpose of owning and developing the South Point Road lot.  Petitioners purchased the land through the partnership to help protect the property from liabilities arising from Dr. Farah's medical practice.  Dr. Farah was told by counsel that holding the land

with his children would make it difficult to attach. Upon formation of the Family Partnership, Dr. and Ms. Farah each held a 35-percent interest. Two of their four children, Frederick Farah (then age 17) and Veronica Farah (then age 11), each owned 15-percent interests.[4] The partnership agreement was signed by Dr. and Ms. Farah. It was not signed by either of their children, nor did either child make a capital contribution to the Family Partnership. The Family Partnership did not register as a business entity in the State of Maryland or obtain an employee identification number.

On the day of its formation, the Family Partnership completed the purchase of the South Point Road lot. At the time of purchase, the only structure on the lot was a tool shed. There was no separate electricity line, well, sewer line, or septic system. At the closing, petitioners paid $51,880 in cash. The balance of the purchase price was financed through a promissory note and a purchase money mortgage to the seller made by the Family Partnership.

Petitioners made improvements to the South Point Road lot. They constructed a bulkhead and concrete path that extended along the shoreline from the Berlin Residence property into the South Point Road lot to protect the property from the water. They also constructed a fence that went around both properties. The lots

---

[4]Petitioners also had two older children, Patrick Farah and another whose name was not disclosed in the record.

were landscaped, and petitioners constructed a chain link dog enclosure.

Petitioners' Move to Berlin

In the spring of 1997, Veronica Farah, petitioners' daughter, was accepted as a freshman at Salisbury State University. It was the only school to which she applied. Salisbury State University is located in Salisbury, Maryland, approximately a 30-minute drive from petitioners' Berlin house.

At that time, Veronica required heightened parental supervision and support, including the regular administration of medication. To support their daughter, petitioners planned to move with her to the Berlin house. In preparation for the move, Dr. Farah put his Hagerstown medical practice up for sale in September 1997. He also closed his Boonsboro practice. In June 1998, Dr. Farah completed the sale of his Hagerstown medical practice.

Ms. Farah moved to the Berlin House in July 1997 to be with Veronica, who was enrolled full time at Salisbury State University from the fall term of 1997 through the fall term of 2001. In addition to her studies, she worked part time at various restaurants and night clubs in Ocean City, Maryland. Ms. Farah drove Veronica to and from class, as well as to and from her part-time jobs. Both Veronica and Ms. Farah received medical

treatment, including surgery, in Salisbury, Maryland, near petitioners' Berlin home.

While living in Hagerstown, petitioners were involved in several social and community activities, such as the Rotary Club, the Northwood Swim Club, the YMCA, and the Maryland Symphony Orchestra. Around the time of their move to the Berlin residence they discontinued their membership or involvement with these activities.

In May 1998, Dr. Farah began working part-time for Sierra Military Health (Sierra) as an Associate Medical Director at Sierra's office, located in Baltimore, Maryland. Among many other responsibilities, Sierra credentials hospitals that provide care to military personnel and their dependents.

In October 1998, Dr. Farah was promoted to full medical director working in quality assurance. The position required that he work 3 days a week at Sierra's Baltimore office. Baltimore is approximately 75 miles from Hagerstown and 138 miles from Berlin. Dr. Farah traveled extensively from Baltimore to various clinics and medical facilities located along the east coast from Maine to northern Virginia. Dr. Farah continued his employment with Sierra until March 28, 2005.

His position with Sierra required that he perform a half-day of clinical work each week, which he did with Towson Express,

located in Towson, Maryland, a suburb of Baltimore.  Towson is approximately 78 miles from Hagerstown and 152 miles from Berlin.

Until October 1998, Dr. Farah served as Medical Director at Victor Cullen Academy, a home for juvenile detainees, located in Sabillasville, Maryland.  On October 7, 1998, his Service Agreement with Victor Cullen Academy was terminated because he no longer lived within 20 miles of the facility.  Hagerstown is approximately 17 miles from Sabillasville.  Berlin is more than 200 miles from Sabillasville.

On April 30, 1999, Dr. Farah neglected to renew his membership on the medical staff of Washington County Hospital, in Hagerstown.  Although Dr. Farah traveled extensively, as often as possible he returned to Berlin at the end of a workday.  He was always in Berlin on weekends and other nonworking days to be with his family.

Use of the Hagerstown House from July 1997 to September 2001

Before the completion of the sale of his medical practice in June 1998, Dr. Farah spent considerable time in the Hagerstown house.  After the sale of his practice, Dr. Farah visited the Hagerstown house more frequently than his wife did.  He would return at least once a month to collect bulk mail sent there.

In contrast, Ms. Farah rarely went to the Hagerstown house. In August of 1999, she stayed in the Hagerstown house for the baptism of her grandson and to renew her driver's license.  To

perform her management duties with the Boonsboro Partnership, Ms. Farah rarely went to the Boonsboro building. She handled all bills and tenant issues by mail or by phone from Berlin.

Although they spent little time in Hagerstown, petitioners always used the Hagerstown address as their mailing address. They used the Hagerstown address on their voter registrations, their vehicle registrations, their driver's licenses, and on all Federal and State income tax returns. During the relevant years, Maryland imposed a local income tax based on the county in which the taxpayer lived. Although the rates changed year to year, a taxpayer domiciled in Hagerstown paid a tax rate of approximately 2.5 percent, while a taxpayer domiciled in Berlin paid only 1 percent during the relevant period. See Md. Code Ann., Tax-Gen. sec. 10-106 (LexisNexis 2004).

All bills associated with the Berlin house were sent to Hagerstown. Petitioners also used the Hagerstown address as their mailing address for two shoreline construction permits obtained for the Berlin house.

Petitioners did not stop water or utility service to the Hagerstown house at any time. Both water usage and electricity usage remained consistent from July 1997 through January 2007.[5]

---

[5]The average quarterly water usage at the Hagerstown house from July 15, 1997 through Oct. 12, 2001 was 128.22 units. The average quarterly water usage at the Hagerstown house from Oct. 12, 2001 through Jan. 23, 2007 was 113.45 units. The average

(continued...)

Christina Farah, who would later marry and divorce petitioners' son, moved into the Hagerstown house with petitioners in 1996. She left in July 1997 to live in Texas with petitioners' son, Patrick Farah. She returned to Hagerstown in January 1998 and stayed until October 1998. Christina's first son was born November 27, 1998, in Dallas, Texas. Petitioners spent Christmas of 1998 in Dallas with Patrick and Christina. Christina returned to Hagerstown in January of 1999. After that, she would go to Dallas periodically for visits usually lasting a week or a weekend. Because Christina's husband was abusive at times, petitioners allowed her to stay in the Hagerstown house rent-free to provide a safe and secure environment for Christina and her children, petitioners' grandchildren.

Christina often forwarded petitioners' mail to them at their Berlin home. She also spent holidays with petitioners at their Berlin home. When Christina was not in Hagerstown, petitioners' son Frederick Farah, who liked to use the hot tub at the Hagerstown house with his friends, would go there to forward the mail.

---

[5](...continued)
electricity usage at petitioners' Hagerstown house from July 15, 1997 through Oct. 11, 2001 was 2,867.62 kilowatt hours. The average electricity usage at petitioners' Hagerstown house from Nov. 9, 2001 through Feb. 14, 2007 was 3,080.23 kilowatt hours.

Petitioners' Move Back to Hagerstown and the Sale of the Berlin House and the South Point Road Lot

In January 2001, Ms. Farah was diagnosed with an aggressive and rare form of lung cancer requiring major surgery and medical followup. At that time, petitioners were unsure of her chances of survival and their prospects for the future. As they needed additional funds, and felt Ms. Farah's future medical needs would be best served in a major medical center, petitioners decided to sell the Berlin house and the South Point Road lot.

In March 2001, Dr. Farah consulted with his attorney regarding his estate plan and the sale of the two properties. On March 11, 2001, petitioners entered into a listing agreement to sell the Berlin residence, together with the South Point Road lot. The listing agreement listed the owner of the South Point Road lot as the Family Partnership. Petitioners never considered selling the properties separately.

In the spring of 2001, Dr. Farah was a candidate for a position on the Maryland Board of Physician Quality Assurance (BPQA). Dr. Farah's candidate submission to the BPQA represented that he resided in Hagerstown, Maryland. In May 2001, Dr. Farah began working part time as the Medical Director for Colonial Management Group in Hagerstown, Maryland. Consequently, Dr. Farah began spending more time in Hagerstown.

On September 24, 2001, petitioners had most of the furnishings of the Berlin house packed and shipped to Hagerstown. On October 27, 2001, both the Berlin house and the South Point Road lot were sold to one buyer for a total of $1,300,000. At the closing, the settlement company prepared separate form HUD-1 settlement sheets for the Berlin house and the South Point Road lot. Petitioners did not know there would be separate settlement sheets for the two properties until the day of the closing. The separate settlement sheets allocated $800,000 of the sales proceeds to the Berlin residence and $500,000 to the South Point Road lot. The allocation of the $1,300,000 between the two properties was not negotiated by petitioners or the buyer. The settlement sheet for the South Point Road lot listed the Family Partnership as the owner. No change in ownership of the South Point Road lot was recorded between its purchase in 1991 by the Family Partnership and its sale in 2001.

Petitioners' 2001 Return and the Notice of Deficiency

On August 15, 2002, petitioners filed their joint Form 1040, U.S. Individual Income Tax Return, for 2001. On the Schedule C, Profit or Loss From Business, attached to their return, petitioners reported gross receipts of $16,798 and expenses of $93,145, resulting in a loss of $76,347. Some of the expenses on the Schedule C related to Dr. Farah's employment with Sierra. Dr. Farah did not maintain his own records for his work

activities with Sierra.  Instead, he relied on records maintained by Sierra, which were destroyed in the fall of 2004.

The Schedule D, Capital Gains and Losses, attached to their 2001 return reported an amount realized of $600,000 from the sale of their Berlin house and a corresponding adjusted basis of $600,000.  The Schedule D did not report the sale of the South Point Road lot.  The Schedule E, Supplemental Income and Loss, reported a loss from the Boonsboro Partnership of $45,733.

On September 19, 2005, respondent issued petitioners a notice of deficiency, disallowing petitioners' Schedule C expenses and Schedule E loss.  Respondent also adjusted petitioners' income to include a capital gain of $660,371 on the sale of the Berlin house and the South Point Road lot.

OPINION

A.  <u>Burden of Proof</u>

Generally the taxpayer bears the burden of proving the Commissioner's determinations are erroneous.  Rule 142(a).  However, the burden of proof with respect to a factual issue relevant to the liability of a taxpayer for tax may shift to the Commissioner under section 7491(a) if the taxpayer has produced credible evidence relating to the issue, has met his substantiation requirements, maintained records, and cooperated with the Secretary's reasonable requests for documents, witnesses, and meetings.

On brief, petitioners argue that the burden of proof on the issue of whether the Berlin house was petitioners' principal residence should shift to respondent. Our resolution of the issue is based on the preponderance of the evidence rather than the allocation of the burden of proof; therefore, we need not address petitioners' section 7491(a) argument. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005). Petitioners bear the burden of proof on all other issues affecting their liability for the deficiency in their Federal income tax.

B.    Section 121 and Principal Residence

Section 121 provides for the exclusion from gross income of up to $250,000 of gain from the sale or exchange of property, if the property was owned and used by the taxpayer as the taxpayer's principal residence for periods aggregating 2 years or more during the 5-year period preceding the sale or exchange. A husband and wife filing a joint return may exclude a maximum of $500,000 of the gain from gross income if at least one spouse meets the ownership requirement and both spouses meet the use requirement of section 121(a). Sec. 121(b).

Petitioners argue that they may exclude the gain from the sale of the Berlin house and the South Point Road lot from their gross income pursuant to section 121 because they owned and used the two properties as their principal residence from July 1997 through September 2001. Respondent argues petitioners are not

entitled to the exclusion for either property because the Hagerstown house was petitioners' principal residence at all times.

Whether a residence qualifies as the taxpayer's principal residence for purposes of section 121 is a question of fact that is resolved with reference to all the facts and circumstances. Sec. 1.121-1(b)(2), Income Tax Regs.; see also Thomas v. Commissioner, 92 T.C. 206, 244 (1989); Clapham v. Commissioner, 63 T.C. 505, 508 (1975). "If a taxpayer alternates between 2 properties, using each as a residence for successive periods of time, the property that the taxpayer uses a majority of the time during the year ordinarily will be considered the taxpayer's principal residence." Sec. 1.121-1(b)(2), Income Tax Regs.[6] In order to meet the 2-year use requirement, occupancy of the residence is required.[7] Sec. 1.121-1(c)(2)(i), Income Tax Regs.

---

[6]Sec. 1.121-1, Income Tax Regs., generally applies to sales and exchanges that occurred on or after Dec. 24, 2002. However, for sales or exchanges of a principal residence before Dec. 24, 2002, but after May 7, 1997, taxpayers may elect to apply sec. 1.121-1, Income Tax Regs., by filing a return for the taxable year of the sale or exchange that does not include the gain from the sale. Sec. 1.121-4(j), Income Tax Regs. The sale of the Berlin residence took place on Oct. 27, 2001. Petitioners' 2001 return did not include the gain from the sale of the Berlin residence. Therefore, sec. 1.121-1, Income Tax Regs., applies to the sale. Nevertheless, our decision in this case would be the same whether or not sec. 1.121-1, Income Tax Regs., applied.

[7]Short temporary absences, such as for vacation, are counted as periods of use. Sec. 1.121-1(c)(2)(i), Income Tax Regs.

For example, if an individual owns homes in New York and Florida, spending 7 months of the year in the New York home, and 5 months in the Florida home, absent facts and circumstances indicating otherwise, the New York home is the individual's principal residence for all of the year. Sec. 1.121-1(b)(4), Example (1), Income Tax Regs. In contrast, if an individual who owns homes in Maine and Montana, lives in the Maine home for 2 years, then lives in the Montana home for 2 years, and then returns to Maine, each house is her principal residence while she lives there. Sec. 1.121-1(b)(4), Example (2), Income Tax Regs.

In addition to the use of the property, other relevant factors in determining a taxpayer's principal residence, include, but are not limited to:

(i) The taxpayer's place of employment;

(ii) The principal place of abode of the taxpayer's family members;

(iii) The address listed on the taxpayer's federal and state tax returns, driver's license, automobile registration, and voter registration card;

(iv) The taxpayer's mailing address for bills and correspondence;

(v) The location of the taxpayer's banks; and

(vi) The location of religious organizations and recreational clubs with which the taxpayer is affiliated.

Sec. 1.121-1(b)(2), Income Tax Regs.

### 1.   The Berlin House

First, we turn to whether the Berlin house, without regard to the adjacent South Point Road lot, was petitioners' principal residence.  Respondent does not dispute that petitioners owned the Berlin house.  Rather, the dispute centers on petitioners' use of the Berlin house as their principal residence.  Ms. Farah's use of the Berlin house is similar to section 1.121-1(b)(4), Example (2), Income Tax Regs.  From 1977 to July 1997 she lived in Hagerstown.  After it was purchased in 1989, she occasionally visited the Berlin house.  In July 1997, she moved to Berlin, rarely returning to the Hagerstown house until September 2001, when she moved back to Hagerstown because of the impending sale of the Berlin house.

Dr. Farah's residency is not as simple.  After his wife moved to Berlin, Dr. Farah continued to spend significant time in Hagerstown until the sale of his medical practice in June 1998. After the sale of his medical practice, he spent far less time in Berlin than his wife because of his work schedule.

In May 1998, he began working for Sierra, a job that required him to be in Baltimore 3 days a week.  Baltimore is approximately 75 miles from Hagerstown and 138 miles from Berlin. The job also required that he travel extensively, though the record is unclear whether that travel substituted for his 3 days in Baltimore.

In addition to his employment with Sierra, Dr. Farah also worked at a clinic a half day a week in Towson, Maryland, a suburb of Baltimore.  Towson is approximately 78 miles from Hagerstown and 152 miles from Berlin.  Petitioners credibly testified that Dr. Farah returned to Berlin on the weekends and on all nonworkdays.  They also credibly testified that he returned approximately once a month to the Hagerstown house after the sale of his practice, and before he began working in Hagerstown in May 2001.  The record is unclear, however, as to where Dr. Farah stayed while working in Baltimore and Towson, and how often his work required him to travel to various medical facilities.  What is clear is that between the sale of his medical practice in June 1998 and his return to work in Hagerstown in May 2001, Dr. Farah spent significantly more time in Berlin than he did in Hagerstown.

Respondent argues that the consistent usage of utilities between 1997 and 2007 in the Hagerstown house indicates that petitioners spent significant time there.  However, the consistent utility usage is explained by the occupation of the Hagerstown house by petitioners' daughter-in-law, Christina Farah, and after January 1999, her newborn son.

Respondent argues that because Dr. Farah's employment with Sierra called for him to work in Baltimore, which is closer to Hagerstown than Berlin, his principal residence must be in

Hagerstown. However, Dr. Farah's employment history indicates he stopped residing in Hagerstown in June 1998. Around the time he began work for Sierra, Dr. Farah sold his Hagerstown practice, gave up his privileges at the local Hagerstown hospital, and was terminated from employment with the Victor Cullen Academy because he no longer lived in Hagerstown or elsewhere within a 20-mile radius of the facility.

Respondent relies heavily on the fact that petitioners used the Hagerstown address on their tax returns, driver's licenses, vehicle registrations, and voter registrations. Petitioners explain that they did not change their mailing address because they wanted to maintain a consistent appearance considering Dr. Farah's myriad professional and business activities, including positions with various State medical boards. Since 1980, Dr. Farah has used the Hagerstown address for all of his business activities. Petitioners further argue that the addresses were not changed on their tax returns, voter registrations, driver's licenses or vehicle registrations because they still resided in Maryland, they still owned the Hagerstown house, they did not believe that changing the address made any difference,[8] and they wanted all mail sent to a single address.

---

[8]In fact, petitioners' residency affected the amount of Maryland local income tax petitioners paid. The local income tax rate imposed on residents of Hagerstown is greater than that imposed on residents of Berlin. See Md. Code Ann., Tax-Gen. sec. 10-106 (LexisNexis 2004).

Respondent argues that petitioners' lack of affiliation with social organizations in the Berlin area indicates that the Hagerstown house was their principal residence. Petitioners were involved in the Rotary Club, the Northwood Swim Club, the YMCA, and the Maryland Symphony Orchestra while living in Hagerstown. The record indicates petitioners discontinued affiliation with the Hagerstown organizations in 1997. Petitioners did not become involved with similar organizations in Berlin. Petitioners explain that they did not join a swim club in Berlin because they lived on the water. Furthermore, they did not join similar organizations because Dr. Farah spent a great deal of time traveling, and Ms. Farah spent much of her time caring for her daughter.

For the foregoing reasons, we hold on the preponderance of the evidence that the Berlin house was Ms. Farah's principal residence from July 31, 1997 through September 24, 2001, and that the Berlin house was Dr. Farah's principal residence from June 30, 1998 through April 30, 2001. Therefore, petitioners have each met the 2-year use requirement of section 121 and are entitled to exclude up to $500,000 of the gain from the sale of the Berlin house.[9]

---

[9]The parties dispute whether the purchase price of the Berlin house was $315,000 as respondent contends, or $365,000 as petitioner contends. The parties stipulated that in addition to the purchase price of the property, petitioners are entitled to
                                                    (continued...)

## 2.   The South Point Road Lot

Having decided that the gain on the sale of Berlin house was excludable under section 121, we now must determine whether the gain on the adjacent South Point Road lot is also excludable. Generally, gain from the sale or exchange of vacant land is not excludable under section 121 unless--

>    (A) The vacant land is adjacent to land containing the dwelling unit of the taxpayer's principal residence;

>    (B) The taxpayer owned and used the vacant land as part of the taxpayer's principal residence;

>    (C) The taxpayer sells or exchanges the dwelling unit in a sale or exchange that meets the requirements of section 121 within 2 years before or 2 years after the date of the sale or exchange of the vacant land; and

>    (D) The requirements of section 121 have otherwise been met with respect to the vacant land.

Sec. 1.121-1(b)(3)(i), Income Tax Regs.

Respondent contends that the South Point Road lot was owned by the Family Partnership, and therefore, petitioners are not entitled to exclude the gain under section 121.  Petitioners

---

[9](...continued)
an increase in basis of $282,054 with respect to the cost of improvements, taxes, and settlement charges.  Accordingly, the adjusted basis of the Berlin house at the time of sale was either $597,054 or $647,054.  The parties stipulated that petitioners received net sales proceeds of $752,582.  Therefore, petitioners realized a capital gain of either $103,528 or $153,528 on the sale of the Berlin house.  As both of these amounts are less than the $500,000 exclusion, we need not decide the basis of the Berlin house.

advance two theories to support their argument that they owned the property.  First, petitioners argue that the partnership was never fully implemented and therefore should be disregarded.[10] Petitioners argue alternatively that the partnership distributed the South Point Road lot to petitioners in 1992.  As we determine that petitioners failed to meet their burden of proving that they owned the property, we need not address whether petitioners have met the other requirements of section 121.  See also sec. 1.121-1(b)(3)(i), Income Tax Regs.

All relevant documentary evidence shows that when the South Point Road lot was sold in 2001, the seller was the Family Partnership.  Petitioners essentially ask us to apply the substance over form doctrine.  They argue that we should disregard the form of the transaction (sale by the partnership) and look instead to the purported substance of the transaction (sale by petitioners).

---

[10]Petitioners do not argue that the Family Partnership should be "disregarded" as the term is used in sec. 301.7701-3(a), Proced. & Admin. Regs., which provides that a noncorporate entity with a single owner can elect to be disregarded as an entity separate from its owner.  Rather, petitioners argue that the Family Partnership was an alternative means for petitioners to hold the property in joint tenancy, and therefore, we should look past the partnership to its purported substance.

If a residence is owned by a single-owner entity that is disregarded for Federal tax purposes under sec. 301.7701-3(a), Proced. & Admin. Regs., the owner is treated as owning the residence for purposes of the sec. 121 ownership requirement. Sec. 1.121-1(c)(3)(ii), Income Tax Regs.  As the Family Partnership has multiple owners, it may not be disregarded under sec. 301.7701-3(a), Proced. & Admin. Regs.

We have observed that "'the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted.'" Ill. Power Co. v. Commissioner, 87 T.C. 1417, 1430 (1986) (quoting Bolger v. Commissioner, 59 T.C. 760, 767 n.4 (1973)). In applying the substance over form doctrine, we are concerned with the intentions of the parties at the time of the transaction. Groetzinger v. Commissioner, 87 T.C. 533, 542 (1986).

To prevail, the taxpayer must provide objective evidence that the substance of the transaction is in accord with the position argued by the taxpayer rather than the form set forth by the relevant documents. Id. at 541. Furthermore, for substance, as opposed to form, to control the tax consequences of a transaction, the taxpayer must establish the claimed substance of the transaction under a heightened burden of proof. Norwest Corp. v Commissioner, 111 T.C. 105, 140, 145 (1998); Ill. Power Co. v. Commissioner, supra at 1434. The strong proof standard requires the taxpayer to present more than a preponderance of the evidence in support of his characterization of the transaction. Ill. Power Co. v. Commissioner, supra at 1434 n.15.

Petitioners argue that although the South Point Road lot was purchased by the Family Partnership, the partnership was never fully implemented, and therefore, it should be disregarded. However, petitioners stipulated that the Family Partnership was

formed. They stipulated that the partners were petitioners and two of their children, and that the partnership purchased the South Point Road lot.

Petitioners argue that because their children did not sign the partnership agreement, contribute to the partnership, and that the partnership did not register with the state or receive an employee identification number, the partnership was not fully implemented. In determining whether a partnership exists under Maryland law, the controlling factor is the intent of the partners to create a partnership. Cohen v. Orlove, 57 A.2d 810, 812 (Md. 1948). Petitioners admit they intended to form a partnership to insulate the property from attachment by judgment creditors. Their minor children were central to that goal because petitioners believed partial ownership by the children would make the property less susceptible to attachment by judgment creditors.

Although petitioners' children did not make contributions to the partnership, partnerships that are created by gift may be recognized for Federal tax purposes. See sec. 704(e); sec. 1.704-1(e), Income Tax Regs. That the partnership never registered with the State of Maryland, nor obtained an employee identification number is not dispositive.

At all relevant times, petitioners represented that the property was held by the Family Partnership. It was not until

receipt of the notice of deficiency that they began to hold themselves out as the owners of the property. Therefore, we hold that petitioners have failed to meet their burden of proving that the Family Partnership was not fully implemented and should be disregarded.

Petitioners argue alternatively that the Family Partnership distributed the property to them in 1992. In support of their position, petitioners introduced into evidence a document purporting to assign the property to petitioners as tenants by the entirety. The document is not a deed. The purported transfer was not recorded, and thus record title to the South Point Road lot remained with the Family Partnership until its sale in 2001. The property was never titled in petitioners' names. Therefore, property tax bills always listed the owner of the property as the Family Partnership. Similarly, the listing agreement and the form HUD-1 settlement sheet listed the owner as the Family Partnership, not petitioners.

Petitioners argue that the property was transferred to themselves to facilitate a refinancing of the South Point Road lot and the Berlin house because the lender required the property be held by petitioners individually. However, the record indicates that after petitioners used the proceeds of the refinancing to pay off the respective purchase loans, there was no longer a mortgage on the South Point Road lot; the only

mortgage was on the Berlin house.  Furthermore, it is unlikely a lender would require a change in ownership, but not require that the change be reflected by recordation of a deed of transfer.

Maryland law recognizes that ownership of property may be, either formally or informally, separated from title to property. Vlamis v. De Weese, 140 A.2d 665 (Md. 1958).  However, we cannot treat lightly the formal manner in which property is held, lest we subject legal titles to unnecessary uncertainties and complicate the administration of law.  Estate of Rosenblatt v. Commissioner, T.C. Memo. 1977-12.

Petitioners had approximately 10 years in which to record the change in ownership of the South Point Road lot, but they did not.  Petitioners contend they had been the owners of the lot since 1992.  However, when selling the property they listed the Family Partnership as its owner.  It was not until petitioners realized ownership of the property through the Family Partnership produced adverse tax consequences that they held themselves out as the owners of the property.  Petitioners were free to organize their affairs as they chose; nevertheless, having done so, they must accept the tax consequences of their choices, whether contemplated or not.  See Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974).

For the foregoing reasons, we hold that petitioners have failed to meet their burden of proving they were the owners of

the South Point Road lot.  As they did not own the South Point

Road lot, petitioners are not entitled to exclude the gain on its

sale under section 121.[11]  <u>Allied Marine Sys., Inc. v.

Commissioner</u>, T.C. Memo. 1997-101, affd. without published

opinion sub nom. <u>Gibbons v. Commissioner</u>, 155 F.3d 558 (4th Cir.

1998).

C.   <u>Penalty Under Section 6662(a)</u>

Section 6662(a) imposes a 20-percent penalty on the portion

of an underpayment attributable to negligence or disregard of the

rules or regulations.  Although the Commissioner bears the

initial burden of production and must come forward with

sufficient evidence showing it is appropriate to impose an

accuracy-related penalty, the taxpayer bears the burden of proof

as to any exception to the penalty.  See sec. 7491(c); Rule

142(a); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2001).  In

order to meet the burden of proof, a taxpayer must present

evidence sufficient to persuade the Court that the Commissioner's

---

[11]The parties have stipulated that the sale of the South
Point Road lot resulted in a gain of $278,962.  In accordance
with the partnership agreement, petitioners had a combined 70
percent profits interest in the Family Partnership.  Therefore,
there is a taxable gain to petitioners of their distributive
share of the gain in the amount of $195,273.

As the Family Partnership qualifies under the "small
partnership" exception to the partnership audit and litigation
procedures, secs. 6221-6233, respondent was not required to issue
a notice of final partnership administrative adjustment to the
Family Partnership.  Sec. 6231(a)(1)(B).

determination is incorrect.  Higbee v. Commissioner, supra at 447.

Petitioners failed to keep adequate records related to their business expenses, claimed highly inflated deductions, misreported the gain from the sale of the Berlin house, and failed to report the substantial gain from the sale of the South Point Road lot.  Therefore, respondent has met his burden of production.

An accuracy-related penalty is not imposed on any portion of the understatement as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1).  Reliance on the advice of a tax professional may constitute reasonable cause and good faith, if under all the facts and circumstances the reliance is reasonable and in good faith.  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000), affd. 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(c)(1), Income Tax Regs.  To qualify for this exception, a taxpayer must prove by a preponderance of the evidence:  (1) The adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Associates, P.A. v. Commissioner, supra at 98-99.

Petitioners argue that they sought professional tax advice for the preparation and filing of their 2001 return. Petitioners presented no evidence of the competence or expertise of their return preparers. Therefore, petitioners have failed to meet the first prong of the Neonatology test. See G. Kierstead Family Holdings Trust v. Commissioner, T.C. Memo. 2007-158.

Petitioners further argue that they provided their return preparers with all their raw financial data. Petitioners' 2001 return listed the amount realized on the sale of their residence as $600,000 and the adjusted basis as $600,000. Neither of these numbers is accurate. The gross proceeds were $800,000, the net proceeds were $752,582, and the adjusted basis was either $597,054 or $647,054. Furthermore, the return did not report any amount with respect to the $500,000 of gross proceeds received from the sale of the South Point Road lot. Considering these major errors and omissions, either petitioners failed to provide their preparers with the necessary information, or the preparers lacked the expertise to properly file a Federal income tax return.

Because petitioners failed to prove they reasonably relied on a competent tax professional, and because they failed to assert any other basis for relief, we hold that petitioners are liable for an accuracy-related penalty under section 6662(a).

In reaching our holdings, we have considered all arguments

made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.